# Commonwealth of Pennsylvania v. Silas C. Swallow, Appellant.

*Libel—Freedom and license of the press—Constitutional rights and restraints.*

The constitution of Pennsylvania secures the liberty of the press but as steadily aims to guard against its abuse.    In the case of an alleged libel of public officers in the public press the rights of the defendant and of

the officers alleged to have been libeled rest on the same constitutional ground. They demand an exact balance of the scales of justice, that security may be given against unfounded aspersions, and that honest investigation of official conduct may not be prevented or unduly restrained by fear of unjust prosecution.

### *Libel—What constitutes privileged communication.*

Where a publication is admitted and is beyond question libelous, with respect to the persons to whom it may be found to refer, to give immunity to such a publication, on the ground of privilege, there must be neither malice nor negligence in making it. It must be made on a proper occasion, from a proper motive, in a proper manner, and upon probable cause.

### *Libel—Inquiry into conduct of public men—Proper occasion and motive.*

Inquiry into the official conduct of officers or men in public capacity, or into any other matter proper for public investigation or information, presents a proper occasion for comment in the public press; and a proper motive and manner exclude malice, both in purpose and phrase.

### *Libel—Probable cause defined—Probative force of circumstances relied on.*

Probable cause for belief excludes negligence, and is judicially defined as "a reasonable ground of suspicion supported by circumstances sufficient to warrant a cautious man in believing that the party is guilty of the conduct imputed to him;" and this cause must exist at the time of making the publication; and must be founded on circumstances of adequate probative force, lying within personal knowledge, or information of such a character as to lead a reasonably prudent man to regard it as trustworthy.

### *Probable cause—Inadequate foundation thereof indicated.*

The newspaper press cannot be regarded, of itself, as an adequate source of information to establish probable cause; neither are statements received at second or third hand, or from persons having no direct knowledge of the matter. Mere hearsay, in whatever guise, however plausible in aspect, broad in volume, or positive in form, is a totally inadequate foundation for belief of a defamatory charge, as are also the repetition and circulation of such charge.

### *Public conduct a proper subject for inquiry, but criticism must avoid detraction.*

The official action of public officers is at all times a proper subject for inquiry by the citizen, and for the information of the public; but even when investigation may reveal conduct that justly deserves censure, a publication on the subject is not to be made a vehicle for unfounded charges or malicious detraction. It is not to be distorted in order to furnish a basis for denunciation or invective.

### *Libel—Evidence—Defective offer to show want of malice and negligence.*

Where in the trial of an indictment for libel errors are assigned to the rejection of evidence which is apparently aimed at showing the absence of malice and negligence, it is held that an offer lacks the precision that

should characterize such an offer of evidence where it is apparent that the reasons which led to the publication, the state of the defendant's information and the facts with which he was made acquainted might be fully shown without disclosing anything tending to prove that the publication was not maliciously or negligently made.

An offer, designed to show this, should state the source of the defendant's information and the specific facts communicated to him, that the materiality of the evidence may appear. Unless the information upon which the publication was made is such as to afford probable cause for belief in its truth, the presumption of malice or negligence remains.

*Libel—Evidence— The entire publication must be admitted—Inadequate complaint of its exclusion.*

In deciding on an alleged libelous publication it must be judged as a whole, since the actual meaning and application of any passage may depend largely on the context. A complaint of exclusion is unfounded when, as appears from the notes of evidence, it was offered by the commonwealth and by permission of the trial judge read to the jury at the time of such offer by defendant's counsel; and when the judge instructed the jury to determine the issue " from the article itself, from the paragraphs, from the article in which those paragraphs appeared and from the testimony," and where twice previously he had said to the jury: " You will have the paper out with you; " and where there is no allegation that it was not sent out with the jury.

*Privileged communication—Facts, not form, determine the question of privilege.*

A publication in form a suggestion to the legislature but in fact a mere publication in defendant's newspaper derives no privilege from its form alone; its only basis for the claim of privilege is that it relates to the official conduct of men in public capacity.

*Evidence—Libel—Article itself not evidence—Materiality of inducing circumstances.*

An article is not itself evidence of the circumstances that led its author to write it, and those circumstances are material only so far as they present ground for belief in its truth.

*Libel—Evidence—Quantum of proof as to implied detraction—Question for the jury.*

In a trial for libel it is error to reject evidence where the offer, although in some respects lacking in precision, from its apparent purpose was to show probable cause for belief that the matters contained in the alleged libelous charges were true. The offer is not fatally defective even if not coextensive with the allegations.

The commonwealth cannot, in the absence of direct accusation, arbitrarily fix the quantum of detraction implied or intended in the publication and demand a corresponding measure of proof in defense. Proof of extravagance has an obvious bearing on the question of fraud. A liberal latitude should be permitted in the admission of such evidence, and nothing

reasonably calculated to show a tenable ground of defense should be excluded through technical narrowness in construing or applying the rules of evidence.

*Libel—Impossibility or inapplicability of the charge not a defense to rebut innuendo.*

It is no defense to a libelous charge that the matter charged is or was impossible. The contention that a certain charge cannot have been intended to apply to a certain officer because delinquencies charged antedated his official career is untenable.

*Libel—Evidence—Malice and negligence—Presumption—Burden of proof —Commonwealth may rebut.*

Malice and negligence are in law presumed from a defamatory publication. When the defense is based on their absence, the burden of proof falls on the defendant, but the commonwealth may, in its discretion, offer evidence in rebuttal.

*Practice, C. P. and Q. S.—Refusal to read nonaffirmed points.*

There is no error in not reading to the jury points which are refused; on the contrary this is the better practice. Com. v. Clark, 3 Pa. Superior Ct. 141, followed.

*Libel—Establishment of absence of negligence a question for jury.*

Whether upon all the evidence the fact that a libelous publication was or was not maliciously or negligently made is for the jury.

*Practice, Q. S.—Motion to quash—Question as to review—Refusal seems to relegate to demurrer or motion in arrest of judgment.*

While a judgment quashing an indictment may be reviewed on error, it is questionable, at least, whether an exception lies to a motion to quash, although this point seems not to have been decided by the courts of this state. *It seems* that such a motion will be held to be addressed to the sound discretion of the court, and that, it being refused, the defendant is left to his demurrer or motion in arrest of judgment.

*Libel—Sufficiency of indictment tested by principles of pleading.*

When language of the character described in the statute is applied to a person by name, there can be no question of its meaning or application. In such case it is only necessary, in an indictment, to identify the prosecutor as the person named by an averment that the language was published of and concerning him; but where the language does not necessarily tend to blacken character or expose to public hatred, etc., or where the person to whom it may refer is not named, it becomes necessary to so frame the indictment, as to show the defamatory meaning of the language and its application to the prosecutor. Whether a given indictment fulfills the above requirements is to be determined by the established rule of pleading.

*Libel—Pleading—Essentials of indictment—Province of court and jury.*

When a publication is not directly defamatory of any person the pleading must indicate its meaning, and to whom it refers, and for this purpose the essentials of a count are (1) an inducement, setting forth sufficiently

the extraneous matters which, it is alleged, give the language the meaning or application contended for; (2) an adequate colloquium, showing this meaning or application; (3) an innuendo declaratory of the sense in which, it is alleged, the language was used. These, as a whole, must contain .everything necessary to make the publication intelligible in the sense thus imputed to it, and to show its defamatory character with respect to the person to whom it is alleged to refer. Whether, in the light of the inducement, and colloquium, the language will fairly bear the meaning ascribed to it by the innuendo, that is to say, whether it is to be pronounced a libel, is to be determined by the court; whether this meaning was intended by the defendant, is to be determined by the jury upon all the evidence.

*Libel—Sufficiency of indictment—Pleading.*

An inducement is sufficient which sets forth the official character of the persons charged to have been libeled, with their duties and the mode in which the performance of these is by law directed; where the innuendo sets forth the defamatory meaning which, it asserts, was intended by the defendant in the language complained of; and where the colloquium adequately exhibits the connection between the indictment and the publication, clearly evidencing, in the manner of charging the offense, certainty to a certain intent in general.

*Libel—Practice, Q. S.—Information—Submission by district attorney— Indictment—All actionable parts of publication may be included.*

The conditions under which an indictment properly may be found without a preliminary hearing are well settled: Green v. Com., 126 Pa. 531. Among these is the action of the district attorney in laying it before the grand jury on his official responsibility, with leave of the court; when this is done the inclusion in the second count of an indictment of a paragraph which was a part of the general subject of the article forming the basis of the prosecution, but which was not included in the information, is not the proper subject for objection by defendant, for it was quite reasonable to expect that all parts of the article relating to the persons referred to might be resorted to on the trial.

Argued March 9, 1898. Appeal, No. 21, March T., 1898, by defendant, from sentence of Q. S. Dauphin Co., March Sess., 1897, No. 69, on verdict of guilty. Before RICE, P. J., WICKHAM, BEAVER, REEDER, ORLADY, SMITH and PORTER, JJ. Reversed. ORLADY, J., dissents.

Indictment for libel. Before SIMONTON, P. J.

It appears from the record and the evidence that the defendant is the editor of the Pennsylvania Methodist, a paper which for a number of years has been published weekly in the city of Harrisburg, Pa., under the auspices of the Central Pennsylvania Conference of the Methodist Episcopal Church. In the

month of February, 1897, the general assembly of the commonwealth was in session in that city, and in the issue of the paper for February 25, 1897, the following article appeared editorially in the Pennsylvania Methodist:

## "AN INVESTIGATION THAT WOULD INVESTIGATE.

"If the State officials are in earnest, and really desire that the tax-payers shall know what has been and is being done with their money. Here is a plan.

"A resident of Harrisburg, who is responsible for what he says, will furnish evidence hereinafter described, on the conditions which follow. Let the Legislature pass an act constituting a Court of Inquiry thus: It shall consist of twenty-five business men or farmers living near enough to the Capitol to render traveling expenses a minimum amount, other conditions being complied with. They shall be men over fifty years of age, who have never held a State office and are not known aspirants for official position. Five shall be appointed by the Mayor of Philadelphia, two each by the Mayors of York, Reading, Lancaster and Williamsport, and one each by the Mayor or Chief Burgess of Lebanon, Pottsville, Carlisle, Chambersburg, Lewistown, Sunbury, Shamokin, Lewisburg, Milton, Danville, Bloomsburg and Huntingdon.

"They shall confine their work to thirty working days, be allowed five dollars a day for their time when on duty, and not to exceed four dollars a day as per bills rendered for all other expenses including board and travel. These expenses shall be paid by the State unless otherwise provided.

"The court shall have access to all books, papers and accounts, and be empowered to send for persons and papers.

"The Harrisburg Citizen, above referred to, proposes to secure an affirmative verdict by at least a two-thirds vote of the Court of Inquiry, on two-thirds of the counts in the following indictment, or failing to do so, will pay all the expenses otherwise to be paid by the State, and will give acceptable bonds in the sum of $25,000 to secure such payment.

"He proposes to furnish evidence to prove:

"1. That persons have been paid money out of the State Treasury who rendered no service to the State therefor, and in some cases made no pretence of service except as politicians serving their party.

"2. That for services rendered the State, persons have been asked to sign receipts for two, three and even four times as much money as they actually received.

"3. That *new* metal furnishings have been paid for by the State, but old ones in use by the State carried into the state house cellar cleaned and returned were made to personate the new ones paid for.

"4. That articles have been furnished for the Soldiers' Orphans' Schools that cost the State eight fold more than reliable bidders were willing to furnish the same articles for.

"5. That in the purchase of materials and labor, for making additions, alterations, repairs and refurnishing the Capitol buildings, and cellars and grounds, also for the Executive Mansion, and now for Grace Church, the State has lost many thousands of dollars as the result of an unfair system of competitive bidding. In other words, that the cost to the State has been two, three, four, and as high as eight times in some instances as much as it should have been, and that not all of this money went to the persons furnishing the materials and labor, and further that at least some of the Board of Public Grounds and Buildings custodians have guilty knowledge of this excessive cost.

"6. That the act of 1895 by which the Governor, Auditor General, and State Treasurer constitute the Board of Commissioners of Public Grounds and Buildings, having control of repairs, alterations and improvements, *and expenses incurred*, including furnishing and refurnishing, is corrupting in its tendencies, pernicious in its results, and has already cost the State at least one hundred thousand dollars more than the same improvements, etc., etc., should have cost under some other system of management.

"7. That the remonstrances which, two years ago, poured into the Governor's hands from the patriotic orders of the state, against the appointment of the present incumbent of the office created by the above act of Superintendent of Public Grounds and Buildings were well founded.

"8. That the burning of the Capitol building, by which the State lost over one million dollars worth of valuable property, if at all accidental was also in a sense incidental. That the possibilities and even probabilities of a fire had been for some

time discussed by employes of the State. And further that there is convincing evidence of criminal carelessness and neglect on the part of the State House Custodians.

"That valuable furniture and furnishings bought for the State are now in use in private homes without any compensation for the same having come to the State.

" The Citizen who proposes to furnish the testimony named, on the conditions named, will suffer the severest penalties of the law rather than summon his witnesses before any committee or court of inquiry, which is the creature of a body whose vote is controlled by one man, and he an intensely interested party.

"The name of the Citizen of Harrisburg, above referred to, will be furnished the Governor, together with the bond of indemnity, immediately on his signing the bill creating the Court of Inquiry, at the office of the Pennsylvania Methodist.

"We herewith respectfully challenge the execution of the threat of certain politicians, to wreck the Pennsylvania Methodist, and to destroy through the partisan press the reputation of its editor, if he permitted the use of his columns for publishing the foregoing statement."

The prosecutor is the superintendent of public grounds and buildings appointed by the governor. An information upon his oath was made on February 26, 1897, before the mayor of Harrisburg as follows: " J. C. Delaney being duly sworn according to law doth depose and say that he is superintendent of public grounds and buildings, appointed by the governor of the state of Pennsylvania, and confirmed by the senate of Pennsylvania; that as such he has charge of the public grounds and buildings and has custody of the personal property, and has charge of the purchase of supplies for the various departments and is charged with all the duties defined in an act of general assembly of the commonwealth of Pennsylvania, entitled an act relative to the public grounds and buildings, and so forth, approved the 26th day of March, A. D. 1895, P. L. 22, and among other things it is his duty under section 11 of said act to examine all bills on account of contracts entered into under the pro-

visions of said act and to ascertain whether the same are correct or not, and to certify that the materials have been furnished or that the work or labor has been done in accordance with contract and so forth.

" That under the law the purchase of new metal furnishings by the state would have to be approved by deponent and certified to be correct. That the said S. C. Swallow is the editor and publisher of a paper called the Pennsylvania Methodist, and that the said S. C. Swallow did on the 25th day of February, 1897, publish the following false, scandalous and defamatory libel of and concerning this deponent in the words following :

" ' That new metal furnishings have been paid for by the state, but old ones in use by the state carried. into the state house cellar, cleaned and returned were made to personate the new ones paid for.

" ' That the remonstrances which, two years ago, poured into the governor's hands from the patriotic orders of the state, against the appointment of the present incumbent of the office created by the above act (meaning the said act of 1895), of superintendent of public grounds and buildings, were well founded.

" ' That the burning of the capitol by which the state lost over one million dollars worth of valuable property, if at all accidental was also in a sense incidental. That the possibilities and even the probabilities of a fire had been for sometime discussed by employees of the state. And further that there is convincing evidence of criminal carelessness and neglect on the part of the state house custodians.

" ' That valuable furniture and furnishings bought for the state are now in use in private homes without any compensation for the same having come to the state.'

" Your deponent further says that all the allegations contained in the above quoted false' and malicious libel are utterly untrue and without any foundation whatever in fact, and that the said S. C. Swallow, well knowing the premises, uttered and pub-lished the said false, scandalous and malicious libel in the county of Dauphin, in the state of Pennsylvania, and further deponent saith not."

The case was presented to the grand jury by the district at-

torney upon leave of court, the indictment framed, containing two counts, being as follows:

The grand inquest of the commonwealth of Pennsylvania, inquiring for the county of Dauphin, upon their respective oaths and affirmations, do present, That heretofore, to wit: on the 26th day of March, A. D. 1895, at the county aforesaid, and within the jurisdiction of this court, in and by a certain act of the general assembly of the commonwealth of Pennsylvania, approved the said 26th day of March, A. D. 1895, entitled "An act relative to the public grounds and buildings; defining the powers of the commissioners to carry into effect the provisions of section twelve, article three, of the constitution, relative to contracts for stationery, supplies, fuel, furniture, furnishings, distribution of documents, repairs, alterations or improvements, and other matters needed by the legislature, the several departments, boards and commissions of the state government and executive mansion; authorizing the appointment of a superintendent, and defining his powers, authority and duties, and providing for the appointment of subordinate officers required by this act and fixing the compensation of the same," it is enacted and provided, among other things, " That the governor, auditor general and state treasurer shall constitute a board to be known as the board of commission of public grounds and buildings, and who shall have entire control and supervision of the public grounds and buildings, including the executive mansion, and all repairs, alterations and improvements made and all work done or expenses incurred in and about such grounds and buildings, including the furnishing and refurnishing of the same, and are authorized to enter into contracts for stationery, supplies, furniture, distribution of documents, fuel, repairs, alterations or improvements and. other matters needed by the legislature, the several departments, boards and commissions of the state government and executive mansion;" and that " The board of public grounds and buildings shall, on the second Tuesday of May of each and every year, by advertisement inserted daily until the day of letting of contracts, in twelve newspapers —not more than three of which shall be printed in any one county — published at such places as the said board may deem proper, invite sealed proposals for contracts to furnish all

the stationery, supplies and fuel, used by the legislature, the several departments, boards and commissions of the state government, executive mansion, and for distributing the laws, journals, department reports and other matter, and for repairing, altering, improving, furnishing or refurnishing, and all other matters or things required for the public grounds and buildings, legislative halls and rooms connected therewith, the rooms of the several departments, boards, commissions and the executive mansion, the said proposals to be delivered to the board of public grounds and buildings on or before 12 o'clock, meridian, on the first Tuesday of June following the date of the advertisement, who shall on said first Tuesday of June, at 12 o'clock, meridian, open and publish said proposals and as soon thereafter as practicable award the contracts to the lowest responsible bidder on each of the items of the several classifications of the schedule, and all such contracts so awarded shall severally be void, unless first approved by the governor, auditor general and state treasurer;" and, "That the enforcement of all contracts provided for by this act shall be under the control and supervision of the board of public grounds and buildings, and for that purpose and all other duties pertaining to said board, they shall be represented by an executive officer to be known as the superintendent of public grounds and buildings, and the governor shall, immediately after the passage of this act, appoint, with the advice and consent of the senate, a superintendent of public grounds and buildings, the term of office of the superintendent shall be four years;" and that " The superintendent shall receive from the contractor or contractors the articles mentioned in the schedule ;" and that, "it shall be the duty of the superintendent when the articles named in the schedule are received from the contractors, to care for them properly in storage rooms, and he shall be held responsible for their safe keeping ;" and that " The superintendent shall keep a full and complete account of all furniture, furnishings, stationery, supplies or fuel delivered to the several departments, boards and commissions, and chief clerks aforesaid, the public grounds and buildings and executive mansion, and at the end of each fiscal year, ending the first Tuesday in June, he shall make a full report of the same to the board of public grounds and buildings ; he shall also with such report submit

a full and complete inventory of all articles of furniture, stationery and supplies in his custody at the end of the fiscal year; and "Wherever any of the furnishings in the several departments, the offices occupied by said state boards or commissions, or in the senate chamber or house of representatives, or in the public grounds and buildings, or the executive mansion shall become unserviceable, such furnishings shall be turned over to the superintendent, who shall give a proper receipt therefor, and he shall make a complete record of such articles, and at such times and under such regulations, as may be prescribed by the board of public grounds and buildings, shall cause the same to be exposed at public sale, due notice of which sale having been given for at least two weeks in two of the newspapers published in the city of Harrisburg, and due notice by mail to the members of the general assembly; he shall also make a complete itemized statement showing the sales and the amount received for each article or class of articles sold, and the total amount received, which statement shall be filed with the board of public grounds and buildings and the money received shall be turned into the state treasury and a receipt taken therefor;" and that "All bills on account of contracts entered into under the provisions of this act shall be examined by the superintendent, and if found correct, he shall certify that the materials have been furnished or that the work or labor has been performed in accordance with the contract, and after being so certified to by him shall be presented to the board of public grounds and buildings for their examination and approval, and when so approved shall be paid by warrant drawn by the auditor general on the state treasury in the usual form."

And the grand inquest aforesaid, upon their oaths and affirmations aforesaid, do further present, That under and by authority and direction of the act of the general assembly of the commonwealth of Pennsylvania aforesaid, the governor of the said commonwealth of Pennsylvania, afterward, with the advice and consent of the senate of the said commonwealth of Pennsylvania, did appoint one John C. Delaney to the said office of superintendent of public grounds and buildings in the said commonwealth of Pennsylvania, for the said term of four years; and thereupon the said John C. Delaney did then and there enter upon and assume the performance of the duties of the said

office of superintendent of public grounds and buildings, and afterward, on the 25th day of February, A. D. 1897, at the county aforesaid, and within the jurisdiction of this court, the said John C. Delaney was employed and engaged in performing the duties of his said office of superintendent of public grounds and buildings, and that Daniel H. Hastings, as governor of the commonwealth of Pennsylvania, and Amos H. Mylin, as auditor general of the commonwealth of Pennsylvania, and Benjamin J. Haywood, as state treasurer of the commonwealth of Pennsylvania, were engaged in the performance of their duties as the members of the board of commissioners of public grounds and buildings of the commonwealth of Pennsylvania, created under and in conformity with the provisions of the act of the general assembly of the commonwealth of Pennsylvania, aforesaid.

And the grand inquest aforesaid, upon their oaths and affirmations aforesaid, do further present that Silas C. Swallow, late of the said county, yoeman, on the said 25th day of February, A. D. 1897, at the county aforesaid, and within the jurisdiction of this court, unlawfully and maliciously minding, contriving and intending as much as in him lay to injure, oppress, aggrieve and vilify the good name, fame, credit and reputation of the said John C. Delaney, being then and there such superintendent of public grounds and buildings, as aforesaid, and Daniel H. Hastings, who was then and there governor of the said commonwealth of Pennsylvania, and Amos H. Mylin, who was then and there auditor general of the said commonwealth of Pennsylvania, and Benjamin J. Haywood, who was then and there treasurer of the said commonwealth of Pennsylvania, and the said Daniel H. Hastings as such governor, and the said Amos H. Mylin as such auditor general, and the said Benjamin J. Haywood as such state treasurer, who were then and there, under and by the authority of the said act of the general assembly of the commonwealth of Pennsylvania, aforesaid, members of and constituted the said board of commissioners of public grounds and buildings of the commonwealth of Pennsylvania, aforesaid, and who were then and there good, peaceable and worthy citizens of the said commonwealth, and to bring them into public scandal, hatred, ridicule, infamy, contempt and disgrace, on the said 25th day of February, A. D.

1897, at the county aforesaid, and within the jurisdiction of this court, unlawfully did wilfully and maliciously compose and write and cause and procure to be composed and written a certain false, scandalous, malicious and defamatory libel of and concerning them, the said John C. Delaney, and of and concerning him, the said John C. Delaney as such superintendent of public grounds and buildings, and of and concerning him, the said John C. Delaney in the performance of the duties of his said office of superintendent of public grounds and buildings, as aforesaid, and of and concerning the said Daniel H. Hastings and Amos H. Mylin and Benjamin J. Haywood, who were then and there such members of and constituting the said board of commissioners of public grounds and buildings of the said commonwealth of Pennsylvania, as aforesaid, containing the false, scandalous, malicious and defamatory words and matter following of and concerning him, the said John C. Delaney, and of and concerning him, the said John C. Delaney as such superintendent of public grounds and buildings, as aforesaid, and of and concerning him, the said John C. Delaney in the performance of the duties of his said office of superintendent of public grounds and buildings, as aforesaid, and of and concerning the said Daniel H. Hastings, Amos H. Mylin and Benjamin J. Haywood, who then and there constituted the said board of commissioners of public buildings and grounds of the commonwealth of Pennsylvania, aforesaid, that is to say:

" 3. That new metal furnishings (meaning supplies of metal furnishings and property received from contractors by the said John C. Delaney as such superintendent of public grounds and buildings, aforesaid, for the said board of public grounds and buildings and the said commonwealth of Pennsylvania, and the said Daniel H. Hastings, Amos H. Mylin and Benjamin J. Haywood, constituting the said board of commissioners of public grounds and buildings of the commonwealth of Pennsylvania) have been paid for by the state (meaning by the state treasurer of the commonwealth of Pennsylvania out of the public funds of the said commonwealth of Pennsylvania in the hands of the state treasurer, and the said Daniel H. Hastings, Amos H. Mylin and Benjamin J. Haywood, constituting the said board of commissioners of public grounds and buildings of the commonwealth of Pennsylvania,) but old one in use by the state (mean-

ing by the said commonwealth of Pennsylvania) carried into the state house cellar, cleaned and returned, were made to personate the new ones paid for." (Meaning thereby that the said Daniel H. Hastings, Amos H. Mylin and Benjamin J. Haywood, as such members of the board of commissioners of public grounds and buildings, and the said J. C. Delaney, as such superintendent of public grounds and buildings, fraudulently and corruptly certified and approved a bill for the payment of the new metal furnishings for the said commonwealth of Pennsylvania, which said furnishings were never received by the said commonwealth of Pennsylvania; but old ones, then owned by the said commonwealth of Pennsylvania, were used, substituted, and made to personate the new; and did, by means of the said trick and device, knowingly, fraudulently and corruptly cheat and defraud the said commonwealth of Pennsylvania out of the price and value of the said new metal furnishings.)

Which said false, scandalous, malicious and defamatory libel he, the said Silas C. Swallow, afterward, to wit: on the 25th day of February, A. D. 1897, at the county aforesaid, and within the jurisdiction of this court, unlawfully did wilfully and maliciously print and publish and cause and procure to be printed and published in a certain newspaper, entitled Pennsylvania Methodist, printed and published in the said city of Harrisburg, in the county of Dauphin, aforesaid, and did thereby then and there unlawfully, wilfully and maliciously expose him, the said John C. Delaney, and the said Daniel H. Hastings, Amos H. Mylin and Benjamin J. Haywood to public hatred, contempt and ridicule, to the great damage, disgrace, scandal and infamy of the said John C. Delaney, Daniel H. Hastings, Amos H. Mylin and Benjamin J. Haywood, contrary to the form of the act of the general assembly in such case made and provided, and against the peace and dignity of the commonwealth of Pennsylvania.

And the grand inquest aforesaid, upon their oaths and affirmations aforesaid, do further present, That heretofore, to wit: on the 26th day of March, A. D. 1895, at the county aforesaid, and within the jurisdiction of this court, in and by a certain act of the general assembly of the commonwealth of Pennsylvania, approved the said 26th day of March, A. D. 1895, entitled "An act relative to the public grounds and buildings; defining the

powers of the commissioners; authorizing the board of commissioners to carry into effect the provisions of section twelve, article three of the constitution relative to contracts for stationery, supplies, fuel, furniture, furnishings, distribution of documents, repairs, alterations or improvements, and other matters needed by the legislature, the several departments, boards and commissions of the state government and executive mansion; authorizing the appointment of a superintendent, and defining his powers, authority and duties, and providing for the appointment of subordinate officers required by this act and fixing the compensation of the same;" it is enacted and provided, among other things, "That the governor, auditor general and state treasurer shall constitute a board to be known as the board of commission of public grounds and buildings, and who shall have entire control and supervision of the public grounds and buildings including the executive mansion, and all the repairs, alterations and improvements made and all work done or expenses incurred in and about such grounds and buildings, including the furnishing and refurnishing of the same, and are authorized to enter into contracts for stationery, supplies, furniture, distribution of documents, fuel, repairs, alterations or improvements and other matters needed by the legislature, the several departments, boards and commissions of the state government and executive mansion;" and that "The board of public grounds and buildings shall, on the second Tuesday of May, of each and every year, by advertisement inserted daily, until the day of letting of contracts, in twelve newspapers—not more than three of which shall be printed in any one county—published at such places as the said board may deem proper, invite sealed proposals for contracts to furnish all the stationery, supplies and fuel used by the legislature, the several departments, boards and commissions of the state government, executive mansion and for distributing the laws, journals, department reports and other matter, and for repairing, altering, improving, furnishing or refurnishing, and all other matters or things required for the public grounds and buildings, legislative halls and rooms connected therewith, the rooms of the several departments, boards, commissions and the executive mansion, the said proposals to be delivered to the board of public grounds and buildings on or before 12 o'clock, meridian, on the first Tuesday of June fol-

lowing the date of advertisement, who shall on said first Tuesday of June, at 12 o'clock, meridian, open and publish said proposals and as soon thereafter as practicable award the contract to the lowest responsible bidder on each of the items of the several classifications of the schedule, and all such contracts so awarded shall severally be void, unless first approved by the governor, auditor general and state treasurer; " and " That the enforcement of all contracts provided for by this act shall be under the control and supervision of the board of public grounds and buildings, and for that purpose, and all other duties pertaining to said board, they shall be represented by an executive officer to be known as the superintendent of public grounds and buildings, and the governor shall, immediately after the passage of this act, appoint, with the advice and consent of the senate, a superintendent of public grounds and buildings, the term of office of the superintendent shall be four years; " and that " The superintendent shall receive from the contractor or contractors the articles mentioned in the schedule; " and that " It shall be the duty of the superintendent, when the articles named in the schedule are received from the contractors, to care for them properly in storage rooms, and he shall be held responsible for their safe keeping; " and that " The superintendent shall keep a full and complete account of all furniture, furnishings, stationery, supplies or fuel delivered to the several departments, boards and commissions and chief clerks aforesaid, the public grounds and buildings and executive mansion, and at the end of each fiscal year, ending the first Tuesday in June, he shall make a full report of the same to the board of public grounds and buildings; he shall also with such report submit a full and complete inventory of all articles of furniture, stationery and supplies in his custody at the end of the fiscal year; " and " Whenever any of the furnishings in the several departments, the offices occupied by said state boards or commissions, or in the senate chamber or house of representatives, or in the public grounds and buildings, or the executive mansion, shall become unserviceable, such furnishings shall be turned over to the superintendent, who shall give a proper receipt therefor, and he shall make a complete record of such articles, and, at such time and under such regulations as may be prescribed by the board of public grounds and buildings, shall cause the same

to be exposed at public sale, due notice of the sale having been given for at least two weeks in two of the newspapers published in the city of Harrisburg, and due notice by mail to the members of the general assembly; he shall also make a complete itemized statement showing the sales and the amount received for each article or class of articles sold, and the total amount received, which statement shall be filed with the board of public grounds and buildings, and the money received shall be turned into the state treasury and a receipt taken therefor;" and that "All bills on account of contracts entered into under the provisions of this act shall be examined by the superintendent, and if found correct he shall certify that the materials have been furnished or that the work or labor has been performed in accordance with the contract, and after being so certified to by him shall be presented to the board of public grounds and buildings for their examination and approval, and when so approved shall be paid by warrant drawn by the auditor general on the state treasurer in the usual form."

And the grand inquest aforesaid, upon their oaths and affirmations aforesaid, do further present, That afterward, to wit: on the 25th day of February, A. D. 1897, and for a long time prior to the said 2d day of February, A. D. 1897, at the county aforesaid, and within the jurisdiction of this court, Daniel H. Hastings was the governor of the said commonwealth of Pennsylvania, and Amos H. Mylin was the auditor general of the said commonwealth of Pennsylvania, and Benjamin J. Haywood was the state treasurer of the said commonwealth of Pennsylvania; and the said Daniel H. Hastings as such governor, and the said Amos H. Mylin as such auditor general, and the said Benjamin J. Haywood as such state treasurer, under and by authority of the said act of the general assembly of the commonwealth of Pennsylvania aforesaid, became and were members of and were constituted the said board of commission of public grounds and buildings of the commonwealth of Pennsylvania aforesaid.

And the grand inquest aforesaid, upon their oaths and affirmations aforesaid, do further present, That under and by authority and direction of the said general assembly of the commonwealth of Pennsylvania, aforesaid, the governor of the said commonwealth of Pennsylvania, afterward, with the ad-

vice and consent of the senate of the said commonwealth of Pennsylvania, did appoint the said John C. Delaney to the said office of superintendent of public grounds and buildings in the said commonwealth of Pennsylvania, for the said term of four years; and thereupon the said John C. Delaney did enter upon and assume the performance of the duties of the said office of superintendent of public grounds and buildings; and afterward, on the said 25th day of February, A. D. 1897, at the county aforesaid, and within the jurisdiction of this court, the said John C. Delaney was employed and engaged in performing the duties of his said office of superintendent of public grounds and buildings according to and in conformity with the provisions of the said act of the general assembly of the commonwealth of Pennsylvania aforesaid, and had in and under his care and control the public grounds and buildings of the said commonwealth of Pennsylvania, and had in his custody and under his care and control the furniture, stationery, supplies and property of the said board of commission of public grounds and buildings and of the said commonwealth of Pennsylvania that had then and there and theretofore been received by him the said John C. Delaney as such superintendent of public grounds and buildings under the provisions of the said act of general assembly of the commonwealth of Pennsylvania aforesaid.

And the grand inquest aforesaid, upon their oaths and affirmations aforesaid, do further present, That afterward, to wit: on the said 2d day of February, A. D. 1897, at the county aforesaid, and within the jurisdiction of this court, the capitol building in the city of Harrisburg, then and there being one of the public buildings of the said commonwealth of Pennsylvania in and under the control, and supervision of the said board of commissioners of public grounds and buildings, and in and under the care and control of the said John C. Delaney, as such superintendent of public grounds and buildings, was burned and destroyed by fire, and thereafter, to wit: on the 2d day of February, A. D. 1897, at the county aforesaid, and within the jurisdiction of this court, a certain other building in the said city of Harrisburg, commonly named and designated "Grace Church," was procured and fitted up by the said John C. Delaney, as such superintendent of public grounds and buildings, and under the authority and direction of the said board of commissioners

of public grounds and buildings, for use and to be used as and for a place of meetings of the senate and house of representatives of ·the general assembly of the commonwealth of Pennsylvania, aforesaid.

And the grand inquest aforesaid, upon their oaths and affirmations aforesaid, do further present, That the said Silas C. Swallow, late of the said county, yeoman, on the said 25th day of February, A. D. 1897, at the county aforesaid, and within the jurisdiction of this court, unlawfully and maliciously minding, contriving and intending, as much as in him lay, to injure, oppress, aggrieve and vilify the good name, fame, credit and reputation of the said Daniel H. Hastings and Amos H. Mylin and Benjamin J. Haywood, so then and there being such members of and constituting the said board of commission of public grounds and buildings of the said commonwealth of Pennsylvania as aforesaid,. and of the said John C. Delaney, so then and there being such superintendent of public grounds and buildings of the said commonwealth of Pennsylvania as aforesaid, and then and there being good, peaceable and worthy citizens of the said commonwealth, and to bring them into public scandal, hatred, ridicule, infamy, contempt and disgrace, on the said 25th day of February, A. D. 1897, at the county aforesaid, and within the jurisdiction of this court, unlawfully did wilfully and maliciously compose and write, and cause and procure to be composed and written, a certain other false, scandalous, malicious and defamatory libel, of and concerning them the said Daniel H. Hastings and Amos H. Mylin and Benjamin J. Haywood and John C. Delaney, and of and concerning them the said Daniel H. Hastings and Amos H. Mylin and Benjamin J. Haywood as such members of and composing the said board of commission of public grounds and buildings of the said commonwealth of Pennsylvania, as aforesaid, and him, the said John C. Delaney, as such superintendent of public grounds and buildings of the commonwealth of Pennsylvania, as aforesaid, and of and concerning the said Daniel H. Hastings and Amos H. Mylin and Benjamin J. Haywood and John C. Delaney in the premises, containing the false, scandalous, malicious and defamatory words and matter following of and concerning the said Daniel H. Hastings and Amos H. Mylin and Benjamin J. Haywood and John C. Delaney, and of and con·

cerning them, the said Daniel H. Hastings and Amos H. Mylin and Benjamin J. Haywood, as such members of and composing the said board of commissioners of public grounds and buildings, as aforesaid, and of him, the said John C. Delaney, as such superintendent of public grounds and buildings, as aforesaid, and of and concerning them, the said Daniel H. Hastings and Amos H. Mylin and Benjamin J. Haywood and John C. Delaney in the premises, that is to say:

"3. That new metal furnishings (meaning supplies of metal furnishings and property received from contractors by the said John C. Delaney as such superintendent of public grounds and buildings, as aforesaid, for the said board of public grounds and buildings and the said commonwealth of Pennsylvania, and the said Daniel H. Hastings and Amos H. Mylin and Benjamin J. Haywood, constituting the said board of commissioners of public grounds and buildings of the commonwealth of Pennsylvania) have been paid for by the state, (meaning by the state treasurer of the commonwealth of Pennsylvania out of public funds of the said commonwealth of Pennsylvania in the hands of the state treasurer, and the said Daniel H. Hastings and Amos H. Mylin and Benjamin J. Haywood, constituting the said board of commissioners of public grounds and buildings of the commonwealth of Pennsylvania), but old ones in use by the state (meaning by the said commonwealth of Pennsylvania) carried into the state house cellar, cleaned and returned, were made to personate the new ones paid for." (Meaning thereby that the said Daniel H. Hastings and Amos H. Mylin and Benjamin J. Haywood, as such members of the board of commissioners of public grounds and buildings, and the said John C. Delaney, as such superintendent of public grounds and buildings, fraudulently and corruptly certified and approved a bill for the payment of the new metal furnishings for the said commonwealth of Pennsylvania, which said furnishings were never received by the said commonwealth of Pennsylvania, but old ones then owned by the said commonwealth of Pennsylvania were used, substituted and made to personate the new, and did, by means of the said trick and device, knowingly, fraudulently and corruptly cheat and defraud the said commonwealth of Pennsylvania out of the price and value of the said new metal furnishings.)

"5. That in the purchase of material and labor for making additions, alterations and repairs and refurnishing the capitol buildings and cellars and grounds, also for the executive mansion (meaning a certain building in the said city of Harrisburg, in the county of Dauphin, set apart by the said commonwealth of Pennsylvania, as and for a dwelling house and place of residence of the governor of Pennsylvania, of the commonwealth as aforesaid) and now for Grace Church (meaning a certain building in the city of Harrisburg known and designated as Grace Church, so as aforesaid, procured and fitted up by the said John C. Delaney as such superintendent of public grounds and buildings, by and under the authority and direction of the said board of commissioners of public grounds and buildings, for the use and to be used as and for a place of meetings of the senate and house of representatives of the general assembly of the commonwealth of Pennsylvania, as aforesaid), the state, (meaning the said commonwealth of Pennsylvania) has lost many thousands of dollars as the result of an unfair system of competitive bidding. In other words, that the cost of the state (meaning the said commonwealth of Pennsylvania) has been two, three, four and as high as eight times in some instances as much as it should have been, and that not all this money went to the persons furnishing the material and labor. And further that at least some of the board of public grounds and buildings custodians (meaning the said Daniel H. Hastings, Amos H. Mylin, Benjamin J. Haywood and John C. Delaney, and meaning the said Daniel H. Hastings, Amos H. Mylin and Benjamin J. Haywood, as such members of and composing the said board of commissioners of public grounds and buildings, as aforesaid, and the said John C. Delaney, as such superintendent of public grounds and buildings) have guilty knowledge of this excessive cost." (Meaning thereby that the said Daniel H. Hastings, Amos H. Mylin and Benjamin J. Haywood as such members of the board of commissioners of public grounds and buildings, as aforesaid, and the said John C. Delaney, as such superintendent of public grounds and buildings, as aforesaid, knowingly, fraudulently and wilfully combined and conspired with certain persons to furnish material and labor in making additions, alterations, repairs, and refurnishing the capitol buildings and cellars and grounds, and also for the executive mansion, and to pay to said

persons as much as two, three, four and as high as eight times as much for said labor and material than other reliable bidders were willing to furnish the same for, with intent to cheat and defraud the said commonwealth of Pennsylvania out of large sums of money by fraudulently and corruptly misusing and misappropriating to themselves and to others the public moneys of the commonwealth of Pennsylvania.)

" Which said false, scandalous, malicious and defamatory libel he, the said Silas C. Swallow afterward, to wit: on 25th day of February, A. D. 1897, at the county aforesaid, and within the jurisdiction of this court, unlawfully did wilfully, and maliciously print and publish and cause and procure to be printed and published in a certain newspaper, entitled Pennsylvania Methodist, printed and published in the said city of Harrisburg, in the county of Dauphin, aforesaid, and did thereby then and there unlawfully, wilfully and maliciously expose them, the said Daniel H. Hastings, Amos H. Mylin, Benjamin J. Haywood and John C. Delaney to public hatred, contempt and ridicule to the great damage, disgrace, scandal and infamy of the said Daniel H. Hastings, Amos H. Mylin, Benjamin J. Haywood and John C. Delaney, contrary to the form of the act of the general assembly in such case made and provided, and against the peace and dignity of the commonwealth of Pennsylvania."

On March 18, 1897, a true bill was found. On March 22, 1897, counsel for defendant moved the court to quash the indictment, assigning the following reasons:

1. Because it does not charge any indictable offense.

2. Because it charges a different offense from that alleged in the information upon which the defendant was bound over to answer at this court, in that it named four persons as libeled, three of whom were not named in said information.

3. The indictment is fatally defective as to the first count, in that: (a) It does not aver that either the said John C. Delaney or the other persons named therein as libeled were concerned in furnishing any new metal furnishings or in procuring the same to be furnished to which the alleged libelous matter could have referred. (b) No extrinsic facts are averred in the said count to connect either the said John C. Delaney or the other

persons named therein as libeled with the metal furnishings mentioned in the alleged libelous matter, and the innuendoes in the indictment connecting them therewith are not supported by the words used in the alleged libelous matter. (*c*) The averment that the publication respecting new metal furnishing is defamatory is unwarranted and frivolous, in that not only no crime or dereliction of duty is charged in the alleged libelous matter, but the first innuendo in said count negatives any such meaning and plainly exhibits that the new metal furnishings mentioned were in fact received by the state. (*d*) The language of the alleged libelous publication is not in itself susceptible of the meaning attributed to said language in the concluding innuendo in said count, and no extrinsic facts are averred in said count exhibiting any such meaning.

4. The second count in this indictment should be quashed: (1) Because it charges an entire and distinct matter, being paragraphed " 5 " in the publication and so set out in the said count, for which the defendant was not bound over to answer at this court as appears by the information and transcript on file. (2) Because it charges a different libel from the information, in that it charges the libeling of four different persons, three of whom were not named in the information. (3) Because the said second count is fatally defective in that: (*a*) The innuendo in said count averring that the alleged libelous matter applied to Daniel H. Hastings, Benjamin J. Haywood, John C. Delaney and Amos H. Mylin is unwarranted, in that the alleged libelous matter does not refer to them, or to any ascertained person or ascertainable from the matter itself, as being the said persons. (*b*) The said count does not aver any extrinsic facts, exhibiting a defamatory meaning in the use of the words set out as the alleged libelous matter as applied to the said Daniel H. Hastings, Benjamin J. Haywood, Amos H. Mylin and John C. Delaney, or either of them, and the words themselves do not contain such intrinsic meaning and are not susceptible of the meaning imputed to them by the innuendoes. (*c*) The said count does not aver that the said defendant at the time of the said publication therein set forth knew that the persons set forth as constituting the commission of public grounds and buildings, together with the superintendent, were in fact the persons constituting the same, and were in custody of the public grounds and buildings,

and so knowing them intended by the said publication to defame the said persons therein enumerated. (*d*) That the innuendoes in this count averring the meaning of a purpose to cheat and defraud the commonwealth of Pennsylvania are not warranted by the language of the publication and no extrinsic facts are set out upon which such innuendoes can be supported.

5. The indictment should be quashed because the alleged libelous publication is a part of an article which, as a whole, was addressed to the lawmakers and officials of the commonwealth, and was directed against a system and called for an investigation by a tribunal therein suggested by which the whole truth touching the matters referred to in the said article might be ascertained. The said article does not libel or charge any criminal act upon any of the individuals alleged to have been libeled.

The motion to quash the indictment, heard before SIMONTON, P. J., and McPHERSON, J., was overruled on March 23, 1897, in the following oral opinion by McPHERSON, J.:

With reference to this motion to quash, we understand there are two grounds on which it is put, which I shall state in the reverse order. First, we have no doubt at all from the form of the recognizance that it binds the defendant to appear and answer the charge that appears in the information, and such others as may be preferred against him—such other charges of like character growing out of the subject-matter of the original act.

The other objection rests, as we understand it, upon the allegation that the bill is not intelligible—not sufficiently intelligible. We have read the bill with sufficient care to be able to say that in our opinion that is not well founded. The act of assembly only requires that an indictment shall be drawn so that the jury may understand the nature of the subject, and the old technical rules certainly have no longer a place in our system of criminal pleading. Moreover we have been expressly commanded by the Supreme Court to entertain motions to quash with extreme reluctance; and there is a very good reason for that, because if the indictment is fatally defective, the remedy is much more effective to move in arrest of judgment.

We therefore overrule the motion to quash.

Mr. Scarlet: Your Honors will note an exception for the defendant.

By the Court: Note an exception for the defendant.

On March 23, 1897, the defendant being arraigned, pleaded not guilty. Counsel for defendant submitted eight points upon which they requested the court to charge. Points five and six are as follows:

5. That it does not appear from the terms of the publication itself that anything stated therein in relation to "metal furnishings" applies or was intended by defendant to apply to any of the persons charged in the indictment to be libeled; and there is no evidence of extrinsic facts from which it can be found that anything stated in relation to metal furnishings applies or was intended to apply to any of said persons; and therefore there can be no conviction on account of that part of the publication relating to metal furnishings.

6. That the language in the publication made by the defendant in relation to "guilty knowledge of excessive cost," charged in the indictment as defamatory of the members of the board of public grounds and buildings does not in its terms apply to any of the members of said board, but to their "custodians;" and that unless the jury are convinced beyond reasonable doubt by evidence outside of the publication that said language was intended to apply to the members of said board, there can be no conviction on account of that part of the publication in which said language occurs.

The other points are set out in full in the charge of the court.

SIMONTON, P. J., charged the jury as follows:

Gentlemen of the jury: On the 25th of February of this year, there appeared in the Pennsylvania Methodist, a newspaper published in this city, an article, part of which was the following: "The new metal furnishings have been paid for by the state, but old ones in use by the state carried into the state house cellar, cleaned and returned, were made to personate the new ones paid for.

"That in the purchase of material and labor for making additions, alterations and repairs and furnishing the capitol buildings and cellars and grounds, also for the executive mansion, and now for Grace Church, the state has lost many thousands

of dollars as the result of an unfair system of competitive bidding. In other words, that the cost to the state has been two, three, four and as high as eight times, in some instances, as much as it should have been, and that not all of this money went to the persons furnishing the materials and labor, and further, that at least some of the board of public grounds and buildings custodians have guilty knowledge of this excessive cost."

The indictment which was preferred against the defendant in this case, and which is now being tried, charges that the words which I have read are a libel upon the board of public grounds and buildings, and the superintendent of that board.

The indictment alleges and sets forth as the ground of complaint against the defendant, that these words, these paragraphs which I have read, charge that board including the superintendent, the members of that board and the superintendent, with corruption or fraud against the state ; in the language of one of the indictments : " Knowingly and corruptly and fraudulently cheating and defrauding the commonwealth." This is the language of one of the counts of the indictment ; and in the language of another " with fraudulently and corruptly misusing and misappropriating to themselves and to others the public moneys of the commonwealth."

That is what is alleged in the indictment to be the meaning of the paragraphs which I have read as contained in the newspaper, and it is also alleged in the indictment that the charge of this corruption is made against the members of this board and the superintendent. The defendant admits that he wrote these paragraphs. He admits that he published these paragraphs in this paper on that date, so that upon these points there is no question.

We come to determine whether in writing and publishing those paragraphs he did charge against the members of this board and the superintendent that which amounts to a malicious libel.

The principles of law that are involved in the determination of the questions thus raised, the defendant having pleaded not guilty, are claimed by the defendant to be as follows : The defendant has asked us to say to you that the law is as contained in the several paragraphs which we shall read to you, and in

order that you may understand clearly the questions involved in this case, and the principles of law that apply to them, we read and answer these points at this stage of our charge, so far as we affirm them.

They have asked us to say:

" 1. That the subject-matter of the article and publication is proper for public information."

That we affirm.

" 2. That if the jury believe from all the evidence that the publication was made without actual malice or negligence, for the honest purpose of giving the public information which it is entitled to have, the defendant should be acquitted."

That we affirm.

" 3. That if the jury find from all the evidence that the publication charged in the indictment as libelous, was made by the defendant upon information sufficient to warrant him in believing that the facts set forth were true; and find further that the publication was made without malice or negligence, the defendant should be acquitted."

That we affirm.

" 4. That in determining malice the jury must take into consideration the occasion of the publication, the information of the defendant and the state of mind he was in at the time of the publication, and the information he had, and that if the publication was made upon probable cause and in good faith, from a sense of public duty, he should be acquitted."

That we affirm.

The fifth point, gentlemen, is refused, and our practice is not to read to the jury the points that we do not affirm.

The sixth point is also refused.

The seventh point was read by the court as follows :

" 7. The publication of the language charged in the indictment to be libelous is privileged unless that publication was maliciously or negligently made ; and the burden of proving malice or negligence is upon the commonwealth."

That is also refused ; reading that was a mistake. In other words, the fifth, sixth and seventh points are refused.

" 8. If the jury have a reasonable doubt as to whether the language of the publication imputes corruption to the parties alleged to be libeled, then the defendant is entitled to be acquitted, and the verdict should be not guilty."

That is affirmed.

Those, gentlemen, are the principles of law so far as we find them stated in the points presented to us by the defendant; whatever further principles we consider to be involved in the case we will state to you as we proceed.

You have then the paragraphs referred to, being paragraphs three and five in the paper which you will have out with you. You have it admitted that they were written and published by the defendant, and you have in the indictment the allegation that these paragraphs apply to the members of the board of public grounds and buildings whose names are given in the indictment, and the superintendent whose name is also given, and that the meaning of those paragraphs as applied to them is to charge them with corruption, with fraud, with cheating the state, and applying to themselves or some other persons the moneys of the state.

You have to determine then, gentlemen, in the first place, what the meaning of those paragraphs is; that is one of the points that you have to determine. You will have the paper out with you, as I have said, and in addition to that you will take into consideration whatever evidence has been given on the one side and on the other, which is relevant to the question of the meaning of those paragraphs. Do they charge corruption and fraud upon the persons named in the indictment? And in that connection, gentlemen, I will call your attention to the issue precisely that we are trying. We are not trying, it is not involved in this case, the question whether there has been extravagance, or whether the soundest judgment has or has not been exercised by those who had charge of the expenditure of public money, so far as related to the public grounds and buildings; that is not the question before us. You have probably learned that by the course of the trial. Many offers of evidence have been made on the part of the defense which were intended to prove that there was extravagance, that there was too much money paid for certain things, and where those offers were not coupled with an offer to show that it involved in some measure either the truth or the excuse for charging the members of the board with fraud or corruption, they have been excluded, and we have the simple question before us to determine in the first place, whether these paragraphs do charge these persons with

fraud and corruption, and you have to determine that as I say from the article itself, from the paragraphs, from the article in which those paragraphs appeared, and from the testimony, other testimony that has been given in the case.

[You are to ascertain what the fair meaning of the language so used is; how would a person of ordinary intelligence understand that? What would he understand it to mean? What would the public, when they would read this, understand these paragraphs to mean—to charge? Would they understand that it charged merely extravagance? If that is all it means, then the defendant could not be held liable in this prosecution. He is charged with having declared that the members of this board were guilty of fraud, of corruption, and not merely of extravagance, and if he has simply charged them with want of such care as they might have taken, he cannot be held for that because he is not charged in the indictment with that, and because he could not be held liable for that. Therefore we have excluded the evidence that simply tended to prove that, and we say to you that you have nothing to do with that question. Your question is, whether they are charged with corruption, to use that word now to mean what I have already stated they are charged with in the indictment.] [16]

[The case, in all its aspects, has been so fully commented upon by counsel on both sides, that I do not intend to go into any detail whatever with respect to the evidence. You have heard that commented upon, and it has been called to your recollection by the counsel on each side, and you are to remember and consider it and from all that taken together, with the reading of the paragraphs themselves, you are to determine whether the fair sense of those paragraphs is that these persons, this board and superintendent, or some of them, were guilty of corruption; whether that is the way in which the language used would be understood; whether the public, when they read this, would take that to be what it meant, and in that connection we take occasion to say to you that neither the testimony of the defendant, nor of the persons who allege that they are charged with corruption, could determine that point.] [17]

The defendant cannot say that those words do not mean what a person reading them would naturally take them to mean, neither can the members of the board say that they do apply

to them, or that they do not; we must take the words as we find them, and from them and the other testimony in the case that applies to that point, so far as there is such testimony, you are to determine whether that is what is charged in these paragraphs.

[If you find then that the language here used does charge corruption, understanding it in the sense which I have already explained to you, and if you find that it applies to the members of this board, that they are the persons who are charged with corruption, if you find those facts, then you have to go to the defense to see what the defense is.   But first there is one other matter that I will refer to.   You have heard it said a number of times during the progress of the trial that this article and these paragraphs are directed against a system.   We have nothing to do with that.   We have nothing to do with the system under which these matters are carried on, the appropriation and expenditure of public money, except so far as this, that no system works itself.   A system, in the sense in which that word is often used, and in which I am using it, and in which the counsel for the defense used it, must be worked by individuals, and we have nothing to do with this system, except so far as to determine whether when a charge is said to have been made against a system, whether it involves charges against the individuals who work the system, and you have heard the testimony in this case as to who are the persons; in other words, you have heard the testimony, and it is admitted on all hands, that the members of this board and this superintendent do work this system, so far as the matters before us are concerned and if the defendant, in desiring to show the evils of the system, has gone so far as—I say that if you should find that he has gone so far as to charge these persons with corruption, the fact that the system was not a good one, or the fact that he wanted to attack the system, would not justify him in charging the persons who were working the system with corruption; to that extent, and only that extent, have we anything to do with the system.] [18]

You will determine, then, gentlemen, whether the members of this board and the superintendent are the persons that are meant here, and whether they are charged in these paragraphs with corruption.   If they are not the persons that are meant, according to the fair reading of the article, or if there is no

charge of corruption against them, then they are not libeled, not under this indictment at any rate, and the defendant would be entitled to be acquitted, but if they are, then you must say whether there is any excuse.

[I am not aware that there is any evidence in the case to prove the truth of the charges made, if there are charges of corruption against these persons—if the counsel for the defense contend that there is any such evidence, they will be kind enough to say so now.

There being no evidence of the truth, the only ground on which the defendant has placed his defense is, that the charges were not malicious and were not negligently made, and that is a question that you have to determine if you reach that point in the case.

I think the jury understand me fully. If the defendant had probable cause to make these charges, if they were not made negligently, and if made without malice, it would be a defense even if the charges were not true, and you are to determine whether they were made without malice and without negligence; whether he had probable cause for making these charges.] [19]

[In order to show that he had probable cause, or that he was not negligent, the defendant himself was put upon the stand, and you heard him testify at length, and you heard him cross-examined also at length; and at this point, gentlemen, I call your attention to this, that he was called, except as to one or two items, to show the grounds on which he made the charges. He was not called to prove the truth of the charges, neither was he called to prove that the grounds upon which he based his charges, that is to say the information which he received was true, and his testimony that he was told by one person one thing and by another person another thing, is not to be taken as testimony of the truth of these charges, but simply as testimony to the fact that he was told these things. You are to distinguish with respect to the testimony of the defendant. You are to distinguish in that respect. He was called to tell what had been told to him, which was his excuse for making these charges.

You heard then what he said had been told to him by one person and another. You heard some of the persons whom he

cited called to say whether they had said those things to him or not, and you remember that those persons were called by the defendant to corroborate him, and you will recall—the matter has been called to your attention on both sides—and it is for you to recall and remember how far those witnesses did corroborate the defendant, or whether in some instances, and if so in what and how many, they did not corroborate him, but denied that they had told him those things.

All that you have to consider and determine; and having weighed that all carefully, you are to say from it all whether it showed that the defendant had probable cause to charge these persons with corruption, with attempts to cheat the state, or with actually cheating the state, or with fraudulently appropriating to themselves or to other persons the moneys of the state. You are to determine how that is. The question, what kind of information would justify the defendant in making these charges, is a question for the jury.] [20]

[In a class of cases something like this, practically the same question is a question for the court, but in the case of excusing a libel it is a question for the jury. The Supreme Court has said that what would amount to probable cause, what would justify a person in making a criminal information, to have a person indicted for a crime, is what would justify him in charging a person with that crime in a libel, and it may perhaps assist you somewhat in determining whether what has been shown, what you find to be the facts in the first place as to what was related to Dr. Swallow, after you have sifted his evidence in connection with the evidence of the other witnesses on the one side and on the other, so far as it applies to this, and after you have found what was told to him and what he knew of his own knowledge, to wit: so far as that applies to the matter of the conservatory and the matter of the granolithic pavement; those are two matters of which he testified as of his own knowledge. Therefore, if you take his direct evidence, after you have sifted the testimony and found what was actually told to the doctor, and what he knew of his own knowledge that applied to this, it may perhaps assist you if you consider whether that was sufficient to warrant a person of ordinary prudence and care to go before a justice of the peace and charge these persons with the crimes which are alleged in

this libel. That is, whether it would be sufficient to go before a justice of the peace and enter an information against them for attempting to cheat the state or defrauding or cheating the state, and for appropriating to themselves money that belonged to the state, for all those would be criminal offenses, and if you come to the conclusion that the information and knowledge which the defendant had would have been sufficient to warrant him in commencing and carrying on a criminal prosecution, then he would be justified or excused rather for making this charge; and if you find that he did not have sufficient, that the evidence was too vague and indefinite to warrant a careful man in making such a charge, or if you find that the evidence was too vague or indefinite to warrant him in making the charge here as he has done, if you find he has, in this libel, then he would not be excused.] [21]

The law also says that to constitute a libel there must be malice; that is a legal expression. It does not mean ill-will against any particular person. It does not mean ill-will against the persons who are charged with whatever the matter is. It means, for the purposes of this case, carelessness, recklessness, disregard of people's rights in making charges against them, when there was not sufficient ground to make charges against them; and if there was not sufficient in this case to warrant these charges against these persons, if there was not probable cause that would justify the charges, that of itself would amount to evidence—would be evidence of malice.

I think that, gentlemen, is all it is necessary for me to say to you. I simply want you to understand distinctly the questions that are before you, and then you are to determine the facts. It is not for me to determine the facts. You are to say whether the defendant charged these persons with corruption and fraud as has been stated, whether that charge is made in the paragraphs and whether it applies to those persons and if it is made and applies to those persons, then you are to go on and say whether there was sufficient excuse for making it, and I have explained to you what that means, and have given you instructions so far as it is my duty, I think, to do so, as to how you are to ascertain whether he had sufficient excuse for making the charges.

There was evidence in the case, you will remember, of an

advertisement in the Patriot, and of sending these slips to other papers, and all of that. If the defendant has given sufficient excuse for publishing the article, then he has given sufficient excuse for sending them to other papers. If he has not given sufficient excuse, that would tend to show malice, tend to show recklessness, that he would not only publish it in the one paper, but send it around to the different towns and cities to other papers as was testified.

The defendant is entitled, in this case, as in all criminal cases, to the benefit of a reasonable doubt. If upon the whole case you are left in doubt, as to the guilt or innocence of the defendant, you give him the benefit of the doubt. That must be a reasonable doubt. It must be such a state of mind—you must arrive at such a state of mind that you cannot fairly and conscientiously, according to your sound judgment, come to the conclusion that the defendant is guilty. If that be the case, you will acquit him. If you convict him, you have nothing further to say. If you acquit you will determine the question of costs.

There is one matter that has been called to my attention. The counsel have not adverted to it, I believe. I probably ought, however, to call the attention of the jury to it, and that is this, gentlemen, in that indictment you will find what are called two counts, that is to say, the offense, or an offense, is charged twice. You will understand it probably when I say there might be two indictments. One of these is with respect to the paragraph, as to the metal furnishings. The other, I believe, included both paragraphs.

Now you can, it is legal for you to convict on the one count or on both counts. [The count as to the metal furnishings depends on paragraph No. 3, and you have heard the evidence that was given in this case in respect to the time when that matter of the metal furnishings occurred, to wit : that it was several years ago. Mr. Kelker, who was vouched for by Dr. Swallow as the authority for that paragraph, says that he told the doctor that it happened some time quite a number of years ago. It could not have happened then during the existence of this board. It could not be an excuse for a charge against the members of the present board of fraud or corruption.

If you find that the fair reading of that paragraph would apply

574 COMMONWEALTH v. SWALLOW.

Charge of Court—Motion in arrest of Judgment. [8 Pa. Superior Ct.

to the present board, if you find that a person—the ordinary reader receiving this paper and reading the paragraph, would understand that the board of public buildings and grounds and their superintendent are charged with fraud in that paragraph, then you are to consider very seriously whether there was, whether there has been, any excuse shown for the publication of that paragraph.

You will consider in that connection what was said by Mr. Kelker, and in that connection Mr. Kelker says that he told the defendant that the matter referred to there occurred a number of years ago, and you will understand, in considering this, that you can convict on one count or both counts. If you convict on both, you simply say you find the defendant guilty, if you convict on one, you say which one—that is, if you find the defendant guilty on the one count or the other, as the case may be.] [22]

Mr. Stranahan : Please note an exception for the defendant.

By the Court: Note an exception for the defendant to the charge of the court and to the answers to the defendant's points.

The jury found a verdict of guilty.

On April 7, 1897, defendant moved for new trial and arrest of judgment, assigning the following reasons for his motion :

1. The indictment does not charge any indictable offense.

2. The indictment charges a different offense from that alleged in the information upon which the defendant was bound over to answer at this court, in that it names four persons as libeled, three of whom were not named in said information.

3. The indictment is fatally defective as to the first count in that: (a) It does not aver that either John C. Delaney or the other persons named therein as libeled were concerned in furnishing any new metal furnishings or in procuring the same to be furnished to which the alleged libelous matter could have referred. (b) No extrinsic facts are averred in the said count to connect either the said John C. Delaney or the other persons named therein as libeled with furnishing or supplying any of the metal furnishings mentioned in the alleged libelous matter, and the innuendoes in the indictment connecting them therewith are not supported by the words used in the alleged libelous matter, nor by the evidence. (c) The averment that the

publication respecting new metal furnishings is defamatory is unwarranted and frivolous, in that not only no crime or dereliction of duty is charged in the alleged libelous matter, but the first innuendo in said count negatives any such meaning and plainly exhibits that the new metal furnishings mentioned were in fact received by the state. (*d*) The language of the alleged libelous publication is not in itself susceptible of the meaning attributed to said language in the concluding innuendo in said count, and no extrinsic facts are averred in said count exhibiting any such meaning. (*e*) The said first count being defective and the verdict being a general one on both counts it cannot be sustained.

4. The second count in the indictment is fatally defective in that: (*a*) It charges an entire and distinct matter, being paragraphed "5" in the publication and so set out in the said count, for which the defendant was not bound over to answer at this court as appears by the information and transcript on file. (*b*) It charges a different libel from the information, in that it charges the libeling of four different persons, three of whom were not named in the information. (*c*) The innuendo in said count averring that the alleged libelous matter applied to Daniel H. Hastings, Benjamin J. Haywood, John C. Delaney and Amos H. Mylin, is unwarranted, in that the alleged libelous matter does not refer to them, or to any ascertained person, or ascertainable from the matter itself, as being the said persons. (*d*) The said count does not aver any extrinsic facts, exhibiting a defamatory meaning in the use of the words set out as the alleged libelous matter, as applied to the said Daniel H. Hastings, Benjamin J. Haywood, Amos H. Mylin and John C. Delaney, or either of them, and the words themselves do not contain such intrinsic meaning and are not susceptible of the meaning imputed to them by the innuendoes. (*e*) The said count does not aver that the said defendant at the time of the said publication therein set forth knew that the persons set forth as constituting the commission of public grounds and buildings together with the superintendent, were in fact the persons constituting the same, and were in custody of the public grounds and buildings, and so knowing them intended by the said publication to defame the said persons therein enumerated. (*f*) That the innuendoes in this count averring the meaning of a purpose to cheat and

576 COMMONWEALTH v. SWALLOW.

Opinion refusing Motion and arrest of Judgment. [8 Pa. Superior Ct.

defraud the commonwealth of Pennsylvania are not warranted by the language of the publication and no extrinsic facts are set out upon which such innuendoes can be supported.

5. The indictment should be quashed because the alleged libelous publication is a part of an article which, as a whole, was addressed to the lawmakers and officials of the commonwealth, and was directed against a system and called for an investigation by a tribunal therein suggested by which the whole truth touching the matters referred to in the said article might be ascertained. The said article does not libel, or charge any criminal act upon any of the individuals alleged to have been libeled.

6. The said second count sets forth as libelous certain words published by the defendant in relation to "metal furnishings," and also certain words in relation to "the purchase of material and labor," as if the whole were an entire and continuous part of the article published by the defendant from which all of said words are taken; when in fact the said words charged as libelous consist of two separate and divided parts of said article; and the words inserted in said article between said two parts and also other words contained in said article and omitted from said count materially alter in favor of the defendant the sense of the words charged in said count as libelous.

On July 13, 1897, the motion for a new trial and arrest of judgment was overruled, SIMONTON, P. J., filing the following opinions:

Opinion overruling the motion for new trial was as follows:

The matters alleged to be libelous in this case were two paragraphs of a two column article published by defendant on February 25, 1897, in a newspaper edited by him. They were styled in the article "Counts in the Following Indictment," and were numbered 3 and 5.

The indictment alleged that these paragraphs were published "of and concerning" the members and superintendent of the board of public grounds and buildings, and that the meaning of the paragraphs was to charge them with "knowingly and corruptly and fraudulently cheating and defrauding the commonwealth;" and "with fraudulently and corruptly misusing and misappropriating to themselves and to others the public moneys of the commonwealth."

Defendant admitted the publication, but denied that he intended it to refer to the board or its members, or that it did in fact charge them with the offenses alleged in the indictment.

The burden was, of course, on the commonwealth to prove that these paragraphs would be understood by the public to charge the members and superintendent of the board, or some of them, as alleged in the indictment; and the jury were instructed that if the commonwealth failed in this proof, defendant could not be convicted. In view of the verdict we must assume that the jury found with the commonwealth on these points.

Defendant further claimed that even if the jury should find against him on the points above referred to, the matters published by him were proper for public information, and he could not, therefore, under the constitution, be convicted, if the publication was not maliciously or negligently made; and his counsel asked the court to instruct the jury that the burden of proving malice and negligence was upon the commonwealth. This the court declined to do, believing for the reasons that we shall proceed to state, that the burden was on the defendant to rebut the presumption of malice arising from the publication of the libelous matter.

The constitution of 1790 provided that, "In prosecutions for the publication of papers investigating the official conduct of officers or men in a public capacity, or where the matter published is proper for public information, the truth thereof may be given in evidence." This was repeated in all subsequent revisions of the constitution until that of 1873, when it was changed as follows: "No conviction shall be had in any prosecution for the publication of papers relating to the official conduct of officers or men in public capacity, or to any other matter proper for public investigation or information, where the fact that such publication was not maliciously or negligently made shall be established to the satisfaction of the jury." An examination of the debate of the constitutional convention will show that it was well understood that this did not make matters proper for public information privileged, so that there would be no prima facia presumption of malice from the fact of publication alone of that which was libelous per se. Mr. DALLAS, of Philadelphia, now a judge of the United States Circuit Court

of Appeals, made a strenuous effort to so amend the provision
in the constitution, which was finally adopted in the form above
given, as to make the publication of matters proper for public
information privileged. When the subject was under discus-
sion, and the appropriate committee had reported for incorpora-
tion in the constitution the provision contained in the previous
constitutions, which simply permitted the truth to be given in
evidence by way of defense, Mr. DALLAS offered to so amend that
the clause should read as follows: "All papers relating to the
conduct of officers or men in public capacity, or to any other mat-
ter proper for public investigation or information, shall be privi-
leged, and no recovery or conviction shall be had or sustained
in any suit or prosecution, civil or criminal, for the publication
thereof, except when such paper shall have been maliciously pub-
lished, and malice shall not be presumed from the fact of publi-
cation." And that the convention might understand clearly
the meaning and purpose of the amendment, he said: "Precisely
what I desire by this amendment is that in all papers affecting
public officers, and in all publications which relate to public
affairs in which the public have an interest and are deeply
concerned, the press of Pennsylvania shall not be presumed to
be malicious, but that malice, when alleged, must be proved
to exist:" 4 Const. Deb. 688. And he said further: "The
committee will observe that in the amendment I have offered
I have used the phrase 'privileged,' and that I propose to
provide that all papers relating to the conduct of officers and
men in public capacity, or in any other matter proper for in-
vestigation or information, shall be privileged. I have selected
that word as one which has been defined to mean just what I
desire to express. The phrase 'privileged communication' is
said to mean that the occasion on which the communication
was made rebuts the evidence prima facie arising from a state-
ment prejudicial to the character of the plaintiff, and puts it
upon him to prove that there was malice. In fact, that the de-
fendant was actuated by motives of personal ill-will, independ-
ent of the occasion on which the communication was made:"
page 691.

The late Mr. Sharpe, of Franklin county, an excellent lawyer,
also stated that this would be the effect of Mr. DALLAS's amend-
ment. He said: "The best authority in this state has declared

that from the publication of the matter itself, if it be of a libelous character, the law infers malice. The amendment of the gentleman from Philadelphia contemplates that the mere fact of the publication alone shall not be prima facie evidence of malice, but that it (malice) shall be a distinctive fact to be proved upon the trial, on the part of the commonwealth in a criminal prosecution, or on the part of the plaintiff in a civil action, as any other fact in the case is proved." And Mr. J. W. F. WHITE, now a judge of Allegheny county common pleas, said, speaking of the publisher: "If he has recklessly put an article in his paper, without stopping to inquire whether it is true or not, it is a monstrous doctrine to say that he shall go scot-free, unless the injured party can prove that he did it maliciously; and that, in my understanding, is the amendment of my friend from Philadelphia:" page 729. Several others of the ablest lawyers in the convention expressed the same views. Pressed by these .objections, Mr. DALLAS afterwards proposed to modify the clause so that it should read: "And malice shall not be presumed from the fact of publication alone." This was, however, not acceptable to the convention, and when the question was put on Mr. DALLAS's proposition, thus amended, only twenty-eight votes were given in its favor and it was rejected.

Subsequently Mr. DALLAS proposed to amend the clause so as to make it read as follows: "All papers relating to the conduct of officers or men in public capacity, or to any other matter proper for public investigation or information, shall be privileged, and no recovery or conviction shall be had in any suit or prosecution, civil or criminal, for the publication thereof, where the fact that such publication was not maliciously made shall be established to the satisfaction of the jury:" 5 Const. Deb. 584. And giving his reason for proposing this change, he said: "I have yielded thus far not to my own judgment, but to my necessities, so that the natural presumption shall go for nothing, but be reversed to meet the views of others; and I now only ask from this convention that the press may have the poor liberty —the miserable privilege—if they make a mistake in their legitimate calling of showing their error to have been not malicious, but unintentional:" page 587. Afterwards a further amendment was offered, adding the word "negligently" after the word "maliciously," which was adopted. But the convention

would not accept this modification, but insisted upon striking out the clause making the matter privileged, and finally it was adopted in the form in which it now stands in the constitution: page 620.

It thus clearly appears that the lawyers in the convention understood the law to be as it has since been declared in Neeb v. Hope, 111 Pa. 145, where Mr. Justice TRUNKEY, delivering the opinion of the court, said: " Malice is said to be essential to an action for libel, but it is malice in a special and technical sense, which exists in the absence of lawful excuse, and where there may be no spite or ill-will, or disposition to injure others. Every publication having the other qualities of a libel, if wilful and unprivileged, is in law malicious. The publication of words actionable in themselves is sufficient evidence of legal malice. Legal malice exists where a wrongful act is done intentionally." And we think there can be no doubt that by the clause of the constitution as it now stands the framers simply intended to permit the defendant to rebut the presumption of malice arising from the fact of publication and to show, if he can that the publication complained of has not been in fact maliciously or negligently made. They evidently agreed in opinion with Judge BRACKENRIDGE that " the idea that a person libeled must prove express malice is of all things the most absurd: " Gray v. Pentland, 2 S. & R. 26.

The implication of malice arising from the publication of matter prima facie libelous therefore remains under the constitution of 1874, and the change made by it in a prosecution for libel is to permit the defendant, when he cannot prove that the matters published were true, to interpose the defense that the publication was not maliciously or negligently made, with the burden of proof on him to make out this defense; and he may do so by showing that he exercised due care in investigating the matter before publication and had probable cause to believe that the charges made by him were true; and it is therefore competent for him to show on what information he acted in making the charges.

This is the theory on which this case was tried, and to establish the defense that the publication had not been maliciously or negligently made defendant testified at length, giving in detail all the facts claimed to be within his own knowledge, and

all the information that he had received which led him to make the publication; and nothing of this kind, however remote, was excluded. And it must not be forgotten that defendant's action must be judged by the information that he then had, and cannot be excused by showing information subsequently acquired; for this could not tend to show excuse for making the publication: Pease v. Shippen, 80 Pa. 513; Foshay v. Ferguson, 2 Denio, 619; Hatfield v. Lasher, 81 N. Y. 248.

The first reason alleged why a new trial should be granted, which is, that the verdict was against the weight of the evidence, does not require any comment, except to say that there was abundant evidence in the case to warrant the verdict.

The second reason alleges that the court erred in rejecting the offer to prove by defendant and other witnesses that there was probable cause for the publication of the alleged libelous article as a whole, and in confiding the testimony to the paragraphs contained in the indictment and numbered 3 and 5.

So far as the case on trial was concerned, no one was complaining of the publication of the rest of the article, and therefore defendant was not called upon to justify it or to prove anything in regard to it, and hence the evidence offered for this purpose was irrelevant. And if he had the fullest justification for publishing all the rest of the article, this would not excuse him if paragraphs 3 and 5 charged the prosecutors as alleged in the indictment; and if these paragraphs did not so charge, he could not be convicted, no matter how libelous or how much without excuse the rest of the article might be; and the jury were instructed to this effect. Moreover, the whole article had already been offered and read in evidence, and was before the court and jury for all proper purposes.

The third reason alleges that the court erred in rejecting offers to prove extravagance and excessive cost of materials.

It is to be remembered that the allegation in the indictment was that the defendant had charged the prosecutors with " knowingly, corruptly and fraudulently cheating and defrauding the commonwealth," and with " fraudulently and corruptly misusing and appropriating to themselves and others the public moneys of the commonwealth." These are charges of a very different character from charges of extravagance. Defendant was not indicted for publishing that the prosecutors

had been extravagant; and the jury were instructed that if that was what he had charged them with—if that was the meaning of the language used—he could not be convicted on this indictment; nor if they had been extravagant would it have been an excuse for charging them with crime. The question, therefore, whether they had been extravagant was not in issue, and was not material, either to the defendant or to the commonwealth. It will be observed that no offer was at any stage of the case made to prove fraud or corruption on the part of the prosecutors. Defendant denied that he had charged them with corruption, and when an offer was admitted because it was understood by the court to be an offer to show that the board of public grounds and buildings paid $70,000 for work which they knew could have been done for $20,000, he did not undertake to prove this, but modified it into an offer to prove simple extravagance, carefully abstaining from offering or attempting to prove corruption or fraud.

As we have already said, defendant was permitted to testify to everything that he had claimed had induced him to publish the paragraphs in question. Nothing of this kind that he chose to say had influenced him to publish was excluded; not even matters that occurred years ago, and therefore could not have led him to believe anything against these prosecutors. It was only when offers were made to prove what confessedly was at the most extravagance, for the purpose of excusing charges of fraud and corruption, that the offers were excluded.

One of the offers made, and objected to and excluded, was simply to prove that the contractor attempted to cheat the state, and that his attempt was discovered, and then, in the language of the offer, "the evil was corrected." This surely did not tend to show justification of a charge of fraud and corruption against the prosecutors, nor did it tend to show the exercise of proper care or probable cause on the part of the defendant. He had already testified that he had been informed of these facts, and that this information was one of his reasons for publishing the article. He had not been informed, nor was there any offer to show that the state had lost anything by the transaction.

The offer to prove an attempt to overcharge for lumber at Grace Church did not include an offer to prove that any money

was improperly or illegally paid, or that defendant had been informed that such was the case.   It was offered merely to show what defendant called "an abuse."   And the whole matter, including the statement that the bill had been approved by the superintendent of the board, was communicated to defendant after the alleged libel was published, which of itself made the offer incompetent.

The offer to show that the amount of $70,000, in the contract for improving the acoustic properties of the house of representatives, was excessive and extravagant, was an offer to prove facts that came to the knowledge of defendant after the publication.   Furthermore, it was not competent to go into the question of the relative value of the work done by the contractor, and that proposed or intended to be proposed, by the witness. The witness had made no bid, and therefore the whole matter was entirely too indefinite and would have introduced new and irrelevant issues.   And the subject-matter of the contract, relating, as it did, to remedying the acoustic properties of the house of representatives, was such that in the nature of the case the value of the work could be determined only after its result was secured.

The eighth reason alleging why a new trial should be granted is closely connected with the foregoing.   This reason complains of errors in the charge to the jury on the subject of extravagance.   The complaint in substance is that the court, after excluding defendant's offer to prove extravagance, charged the jury to find whether there was extravagance or not.   That the court, in other words, excluded evidence offered by defendant to sustain one of the issues that was afterwards submitted to the jury.   This was not a correct statement of the situation.

In the instructions complained of the question submitted to the jury was not whether there had been extravagance or corruption or fraud, but whether the public, reading the paragraphs in question, would understand extravagance only to be charged, or corruption or fraud.   And they were expressly told that the issue was not whether there had been extravagance, but what was the meaning of the language used in the publication.   If the language used did not charge corruption and fraud, but merely extravagance, the defendant could not be convicted.   Now, however, counsel contend that evidence tend-

ing to prove extravagance was excluded, and then the question was left to the jury, by the court, to find whether there had been extravagance or had been corruption. This the court did not do, and no such issue was raised in the case or presented to the jury.

The learned counsel also contend that evidence of extravagance was relevant to the question of the meaning of the language of the publication. They say: "How could the jury say whether the words meant extravagance or something else, without knowledge of the character of the extravagance which admittedly exists, as to whether it was a mere indiscretion or the reckless use of public money?" The vice of this argument is that it assumes that the jury were to ascertain the meaning of the language from proof of the existence of facts first ascertained long after the language was used. It assumes that if the jury find that there was extravagance only, they are then to infer that the language of the paragraphs complained of charges extravagance only. But if this be so, there must be the further assumption that there must be proof of corruption before the langauge can be held to charge corruption. This would lead us to the reductio ad absurdum that the commonwealth must prove the prosecutors guilty of corruption and fraud before it can ask the jury to find that the defendant has charged them with these offenses.

The commonwealth might have indicted defendant for libeling the prosecutors by charging them with carelessness and extravagant use of public money, if that had been the meaning of the language used. But this was not done. The indictment alleged that he had charged them with "knowingly and corruptly and fraudulently cheating and defrauding the commonwealth;" and with "fraudulently and corruptly misusing and appropriating to themselves and others the public moneys of the commonwealth." Whether he had done this—whether the language he had used meant this—was the issue tendered by the indictment, and as the jury were told, by this issue the case must stand or fall. If the jury did not find, not only that the prosecutors were the persons charged, but also that the charge was that they had been guilty of the offenses thus stated in the indictment, defendant could not be convicted, whether there had or had not been extravagance in the use of the public moneys, and in the making of contracts.

The fifth reason is that the court erred in admitting the rebutting testimony of Governor Hastings and of Mr. Pyne. This testimony was offered to show that there were sources of information open to defendant, of which he did not choose to avail himself, from which he could have readily learned the truth or falsity of information he had received with respect to the contract for altering or remedying the acoustic properties of the house of representatives, thus tending to prove negligence and want of due care. From the nature of the case defendant knew that he could obtain information on this subject from the governor, and we think it was competent on the question whether he exercised due care to show that he did not seek this information.

· It was not shown that defendant had been told who had sold the clocks, but as he could easily have learned this by an inquiry at the proper department, or could at least have shown that he made some effort to ascertain this fact, we think the evidence of Mr. Pyne was competent, when coupled with the fact that the information on which defendant relied was given to him at second hand by an informant, who, as he testified, did not give her true name.

There are a number of other reasons assigned why a new trial should be granted, which in effect call in question the whole of the charge to the jury, but very little stress was laid upon these in the argument on the motion, and we do not think it necessary to discuss them.

The last reason, which alleges bias and prejudice in the mind of the jurors, is in our opinion not made out by the evidence taken to support it, which is too vague and indefinite and too flatly contradicted by the juror in question to be made the basis of an order granting a new trial.

The motion for a new trial is overruled.

Opinion of court below overruling motion in arrest of judgment.

We shall not undertake to refer at length to the voluminous reasons assigned in support of this motion. As we understand them, one is that defendant was indicted for libeling persons not named in the information on which he was bound over to answer.

The recognizance into which he entered bound him to answer the charge recited in the information made against him, "and such other charges as may be preferred against him and not to depart the court without leave."

That this required him to answer all the indictments—at least for libel—found against him at that term is clear from the words of the recognizance itself; and if authority for this be needed, it will be found in Queen v. Ridpath, 10 Mod. 152, People v. Stager, 10 Wend. 431, and 1 Bish. Crim. Proc. 264 *b.*

A further reason why this objection cannot be sustained is, that the indictment as found was sent to the grand jury by the district attorney with the express leave of court so to do.

Another reason assigned why judgment should be arrested is, in substance, that no persons are mentioned in the alleged libelous paragraphs, and it cannot therefore be ascertained from the language used that any definite person or persons are meant. The board of public grounds and buildings are mentioned, and the matters alleged are such as are shown by the indictment to be within the exclusive jurisdiction of this board, and the paragraphs complained of must therefore refer to its members. This brings the case within the rule laid down in The King v. Jenour, 7 Mod. 400, where a libelous publication concerning an East India director, not naming him, was held to be a libel against the East India Company, Chief Justice LEE saying : " Where a paper is printed equally reflecting upon a certain number of people, it reflects upon all ; and readers, according to their different opinions, may apply it so.  . . .   Now, as this is equally applicable to all the directors, the readers may equally apply it to any one."

Another objection is, that the innuendoes in the indictment are not warranted by the language used by defendant, and that there is no colloquium to support them.

In Commonwealth v. Keenan, 67 Pa. 203, Justice AGNEW said, delivering the opinion of the court: " It is sufficient in indictments that the charge be stated with so much certainty that the defendant may know what he is called on to answer, and that the court may know how to render the proper judgment thereon. Overnice exceptions are not to be encouraged, especially in cases which do not touch the life of the defendant. Following out this view, the revisers of the late criminal

code gave it form and body in the 11th section of the Criminal
Procedure Act of 31st of March 1860, by providing that every
indictment shall be deemed and adjudged sufficient and good
in law which charges the crime substantially in the language
of the act of assembly prohibiting the crime, or, if at common
law, so plainly that the nature of the offense charged may be
easily understood by the jury. Thus it is evident from the cur-
rent both of decision and legislation, that criminal pleading is
no longer the technical thing it was, and that courts should look
more to substantial justice than artificial nicety. It may not
be very important, and yet it is not amiss to say, that a libel is
now a statutory offense under the 24th section of the act of
31st March 1860. . . . It belongs to the jury to say whether
the meaning averred in the innuendo expresses the true mean-
ing of the words. The intent of the author in writing the words
is a question of fact and not of law, and may be drawn from
intrinsic evidence. If, therefore, there be anything on the face
of the libel to give color to the innuendo, it must be left to the
jury to pass upon the meaning averred. . . . Taking the words
in the same sense in which the rest of mankind would ordinarily
understand them, it is for the jury to say whether, in their minds,
they convey the idea imputed." See also King v. Burdett, 4
Barn. & Ald. 314.

Without pursuing the matter further, we are of opinion that
the indictment is good, and the motion for arrest of judgment
is therefore overruled.

July 19, 1897, sentence of the court that defendant pay a
fine of $500 and costs, etc. Defendant appealed.

*Errors assigned* were (1) in overruling the defendant's
motion to quash the indictment. (2) In overruling the defend-
ant's motion in arrest of judgment. (3) In rejecting the evi-
dence offered by defendant as covered by the following offer,
objections and ruling of the court, viz: "Q. You were the au-
thor of the article published in the Pennsylvania Methodist on
February 25, 1897, entitled 'An Investigation That Would In-
vestigate?' A. I am. Q. State the facts as they were pre-
sented to you that led to the publication of that article." Mr.
Graham: Wait. "A. A short time after coming to Harris-
burg—" Mr. Graham: Wait, wait. We object to the doctor

giving in evidence what induced him to publish the entire article. Much of it relates to other parties and can have no relation whatever to this trial; first, as to the metal furnishings; second, as to the alterations and repairs at the capitol building, executive mansion and Grace Church, to which he refers in section 5 of his article.

By the Court: In other words, section 3 and section 5.

Mr. Graham: Yes, limit it to those.

Mr. Scarlet: Defendant being upon the stand, defendant's counsel propose to prove by him and offer in evidence the whole article, and the reasons which led to its publication, the state of his information, and the facts with which he was made acquainted; this for the purpose of rebutting malice and any charge that they are made as stated in the indictment.

Mr. Graham: Objected to as being irrelevant, immaterial and not pertinent to the issue, and further the objection is, that it contains matter relating to other parties, allegations that themselves might be the subject of other indictments, and what might have led the doctor to publish those articles can neither be of interest to, nor can it shed light upon, the present investigation.

By the Court: The indictment here is for making certain charges which are definitely designated as paragraphs 3 and 5, and we have only to do with those articles at present, and the purpose for which this evidence is offered, being to show the absence of malice or negligence in the publication of the matters with which he is charged as the libel, we think the evidence must be confined so far as it relates to the information and facts that he had about those articles. We do not by this exclude the whole article from being in evidence in the sense in which it has already been given in evidence, but the question now is with respect to the matters charged in the indictment, and therefore the offer as made, or the question asked, is excluded.

Mr. Scarlet: Please note an exception.

By the Court: An exception is noted for the defendant.

4. In rejecting the evidence offered by defendant as covered by the following offer, objection and ruling of the court, viz:

Mr. Scarlet: We now offer the article in question with the exception of that section which relates to Soldiers' Orphans'

Schools, for the purpose of showing that it is a privileged communication addressed to the legislative assembly for the correction of an abuse and not directed to the parties named in the indictment, for the purpose of rebutting malice and also for the purpose of showing what led him to write the whole article.

Mr. Graham: Objected to for the same reasons previously stated.

By the Court: The ruling which we have already made is broad enough to cover this offer and to exclude it. It would be no defense to the publication of the charges laid in this indictment to show the entire justification for any other charges that may be made in this paper, and I think that of itself illustrates the fact that it cannot be evidence in the trial of this case.

The offer is excluded and exception noted for the defendant.

Mr. Scarlet: What information did you have prior to the publication of the article in question which led you to publish paragraph 5 in that publication. (Discussion.)

Last question read by the stenographer.

" A. The publication of the article under review and part of the editorial in the Pennsylvania Methodist of February 25, 1897, was prompted by an investigation. That investigation was prompted in part by an article appearing in the Philadelphia—or rather appearing in a New York paper—calling attention to the probable abuses in connection with the finances—"

Mr. Graham: We object to this statement as not responsive to the question that is asked him, and because it introduces what has been excluded by your Honor.

By the Court: The doctor must understand that that has been ruled, and that he will conform to the ruling of the court. (Discussion.)

By the Court: He can show that he made the investigation and what he learned.

The witness: About two years ago, in addition to what I had seen in the New York paper, I saw in the Philadelphia Times statements with regard to the finances of the state.

Mr. Graham: We object to that.

By the Court: Doctor, you will confine yourself to paragraph 5 ; what you learned about that.

" Q. What information did you have with regard to the statements made in paragraph 5, which led you to publish it? A. Now, in answer to that question, I must state, I cannot get away from it—I must state that the articles published in the Philadelphia Times in regard to extravagance—"

Mr. Graham (interrupting) : We object to that on the same grounds as before.

" Q. Whether you can state whether the article which you saw in the Philadelphia Times referred particularly to any items which are mentioned by you in paragraph 5 ?   A. It did, most emphatically.   Q. What were they ?   A. Extravagance in the administration of the affairs of state. (Objection renewed.)

By the Court: Now, Doctor, unless you confine yourself and adhere to the ruling of the court, we will see whether we have the power to enforce our ruling. It is time for him now to understand it, or we will find a way of teaching him.

(5) In rejecting the evidence offered by defendant as covered by the following offer, objection and ruling of the court, viz:

Mr. Scarlet: Witness J. G. Coder being upon the stand, counsel for defendant propose to prove by him that subsequent to the producing of the article in question, he made a measurement of the lumber in Grace Church and an examination of the bills presented, and that the bills presented for the lumber in that church measured or claimed for 146,000 feet, and that upon actual measurement there was but 86,000 feet, making an error of 60,000 feet in the lumber there placed, and that that bill had been O. K'd by J. C. Delaney, the superintendent of public grounds and buildings. This for the purpose of showing the truth of the article as claimed by the defendant in this case, as exhibiting an abuse—which lumber had been furnished and put in place long prior to the publication of the article in question.

By the Court: Let us know in that offer when it was O. K'd.

"Q. Do you know when it was O. K'd?   A. I think it was O. K'd prior to the 25th."

By the Court: Then you put that in your offer to prove that it was O. K'd prior to the 25th?

Mr. Stranahan: We still ask him to produce the bill.   (The offer objected to as irrelevant, immaterial, incompetent and not bearing upon the issue.   Discussion.)

Offer read by the stenographer.

Mr. Graham: I object to that for the manifest reason that all that took place—took place subsequently to February 25, except the alleged O. K'ing of the bill. There is no allegation here that one dollar of money was wrongfully taken from the treasury. No allegation that one dollar of money was improperly distributed by other parties. (Discussion.)

By the Court: I do not think that this offer tends to show the truth or untruth of anything that is alleged in that article, therefore I think it is incompetent and it is excluded, and an exception is noted for the defendant.

(6) In rejecting the evidence offered by defendant, as covered by the following offer, objection and rulings of the court, viz:

"Mr. Coder, when your plans were submitted to the governor, what did he say of them with reference to the others?"

By the Court: In admitting this, we do not exclude the counsel from making an objection to any item of the evidence as it goes along, because it is on the borders; there is no doubt about it. (Argument by Mr. Gilbert.)

Mr. Scarlet: What is your answer to my last question?

Question read. "A. He said that they were the only propositions that they had had that pleased him, I think. Q. Was that all? A. That we should hear from him again. Q. After the work was done by Mr. Hodges, what examination and comparison did you make of the work done to the plans proposed by you?" (Objected to by Mr. Graham.)

By the Court: That is excluded. Exception for the defendant.

(7) In rejecting the evidence offered by defendant as covered by the following offer, objection and ruling of the court, viz:

Mr. Scarlet: The auditor general and member of the public grounds commission being upon the stand, it is proposed to show by him from the paper that he has in his hands, that that is the original proposition of a Mr. Hodges of New York, I believe, to the board of public grounds under which the changes to the house of representatives testified to were made, and this for the purpose of showing that it was not done on a system of competitive bidding but by an offer on the one part accepted by the board upon the other.

By the Court: I want to know your purpose, the legal conclusion that you are going to ask to be drawn from it.

Mr. Scarlet: To be followed by proof that the other propositions were made to the said board for a much less sum, to wit: $20,000, and that the work done under the proposition accepted by the board in this instance, was a much larger and more extravagant sum than the same work could be done for, to wit: $70,000.

The legal conclusion is this: In justification of the article, to wit: that it had cost the state a much larger sum to make repairs, changes and improvements in the public buildings or grounds—whatever work was done there—much larger than reliable bidders were willing to do the same thing for; this for the purpose of showing extravagance and in justification of the article and excuse. (Objection renewed as to the last offer.)

By the Court: If that is all that is offered to be proved it is not relevant. The charge is not simply that there was extravagance, but to use a single word to characterize it, the charge is that there was corruption. The justification is not as large, in other words, as the charge.

Mr. Scarlet: Perhaps I had better add to the offer, this, and include it in the ruling—and to negative the idea of negligence and malice in making the publication complained of.

By the Court: I do not see how that could tend to negative the idea of negligence. (Argument by Mr. Scarlet and exception noted for the defendant to the ruling of the court.)

(8) The court erred in rejecting the evidence offered by the defendant as covered by the following offer, objection and ruling of the court, viz:

Mr. B. G. Galbraith: Recalled on behalf of the defendant and further examined as follows:

Mr. Scarlet: "Q. If you know what party controlled the Stewart patent used in granolithic paving?" (Objected to as not relevant, immaterial and not pertinent to the issue.)

By the Court: I can't see its pertinence.

Mr. Scarlet: The object of this question is to be followed by the offer of the schedule issued by the board of commissioners of public grounds for granolithic pavement in which the Stewart patent is called for, and for the purpose of showing that all others would be excluded from bidding on paving of that character.

By the Court: For what purpose? For what legal conclusion to be drawn from it?

Mr. Scarlet: It was testified by Dr. Swallow upon the stand that but one party, from the information that he had received, had exclusive control over the Stewart patent, and that all others were excluded from bidding on granolithic pavement of that character. By reason of that, and in support of his criticism of the system, as we allege in the article, and further to corroborate him and to show that the article was published without any malice, was privileged and upon probable cause.

Mr. Graham: Objected to as not relevant and immaterial.

By the Court: I think it comes within the rulings that we have already made. What we are trying here is certain charges, alleged by certain persons to have been made against them, as I have before said, to get a convenient word, charging them with corruption, and that is the only matter that is pertinent to this issue.

Mr. Scarlet: We propose to follow it by this schedule. I do not know that my offer contained the page upon which this is found—page 28 of the schedule of the senate and house of representatives.

Your Honor will note an exception for the defendant.

By the Court: Exception noted for the defendant.

(9) In rejecting the evidence offered by the defendant as covered by the following offer, objections and ruling of the court, viz:

Mr. Jackson: I offer the contracts and bills for gas and electric light fixtures furnished to Grace Methodist Church to be followed by testimony showing that the amount of the contract —the amount to be paid by the state under the contract is grossly excessive for the fixtures furnished.

Mr. Gilbert: For what purpose?

By the Court: For what purpose?

Mr. Jackson: For the purpose of showing excessive cost to the state.

By the Court: What legal conclusion is to be drawn from it?

Mr. Jackson: To show first, absence of malice and negligence, and further to prove the truth of the paragraph alleged to be libelous.

By the Court: Is there any objection to that?

Mr. Graham: Objected to as incompetent, irrelevant, immaterial, and does not touch the issue. (Argument by Mr. Jackson in support of his offer.)

By the Court: The offer is excluded and exception noted for defendant.

(10) In rejecting the evidence offered by the defendant as covered by the following offer. Objection and ruling of the Court, viz:

Mr. Scarlet: Counsel for the defendant propose to show by the witness on the stand, in corroboration of the statement made by Dr. Swallow this morning upon the stand, that upon complaint having been made to the board, and their attention called to the fraud in the lieutenant governor's room, the substitution of Dutch metal for the gold leaf called for in the specifications, that he was called on by the board to make the test, it having been denied by the superintendent of public grounds and others, that such substitution had been made.

By the Court: What is the purpose of it?

Mr. Scarlet: For the purpose of corroborating the story of Dr. Swallow, and further to show that this statement in regard to that had been verified, and that therefore there was probable cause for the publication so far as the article related to it, and is therefore excusable.

By the Court: So far as the article related to what?

Mr. Scarlet: The furnishing—the excessive cost in furnishing the lieutenant governor's room. (Objected to on the same ground as before.)

By the Court: We think it comes within the same principle. The existence of matters testified to by Dr. Swallow do not tend to charge—do not go to the matter charged here, that is involved in this issue, and the testimony of this witness to the same fact, would not tend to establish one way or the other, the issue that we are now trying, and for that reason it is excluded. An exception noted for the defendant.

(11) In rejecting the evidence offered by the defendant as covered by the following offer, objection and ruling of the Court, viz:

Mr. Scarlet: Defendant's counsel propose to prove by the witness upon the stand, that he made an examination of the quantity of lumber in Grace Church; that he found that it was only about 86,000 instead of 146,000 as billed for, and that the lumber was of inferior character, and that the price paid for it, or proposed to be paid for it—the contract price was far in

excess of the real worth and value of the work done and the lumber.

By the Court: What is the purpose?

Mr. Scarlet: This for the purpose of excusing the article and explaining it as published by the defendant.

Mr. Graham: This is objected to as irrelevant, immaterial and not pertinent to the issue, and it comes within the rulings that your Honor has already made.

By the Court: For the same reason as has heretofore been given, this offer is excluded, and exception noted for the defendant.

(12) In admitting the testimony of Joseph Pyne, offered by the commonwealth, as covered by the following offer, objection, ruling of the court and testimony received, viz:

Mr. Graham: It is now offered on the part of the commonwealth to prove by the witness Pyne on the stand, that he is the person who was the contractor that furnished the two clocks mentioned by Dr. Swallow in his testimony, and that he did not make any gift or present of a clock or of anything else to Captain Delaney or any one else. (Objected to as both incompetent and irrelevant, and that Dr. Swallow's testimony in reference to this matter cannot be contradicted in this way, and there is no testimony in the case that shows that Dr. Swallow knew that these two clocks or any two clocks were furnished by Mr. Pyne.)

By the Court: We do not understand it to be an offer to contradict Dr. Swallow. It does not tend to contradict him because what Dr. Swallow testified was simply as to the information that had been conveyed to him, but it contradicts the implication that an improper matter or thing was done, and therefore we think it competent, and it is admitted, and an exception noted for the defendant.

"Q. Mr. Pyne, are you the contractor referred to that furnished the two clocks for the lieutenant governor's rooms? A. I am, yes, sir. Q. State whether or not you made in that connection, or in any connection, a present of a clock to Captain John C. Delaney, directly or indirectly? A. I did not. It would be impossible, the way the bid was, if I did want to. I never gave any one a clock or anything else. Q. Nor anything else? A. Nothing else. Q. That statement then is absolutely untrue? A. Yes, sir."

(13) In refusing the fifth point submitted by the defendant, and which point was not read or made known to the jury, and which point and answer are as follows :

5. That it does not appear from the terms of the publication itself, that anything stated therein in relation to "metal furnishings" applies or was intended by the defendant to apply to any of the persons charged in the indictment to be libeled ; and there is no evidence of extrinsic facts from which it can be found that anything stated in relation to metal furnishings applies or was intended to apply to any of said persons ; and therefore there can be no conviction on account of that part of the publication relating to metal furnishings. *Answer :* The fifth point, gentlemen, is refused and our practice is not to read to the jury the points that we do not affirm.

(14) The court erred in refusing the sixth point submitted by the defendant, and which point was not read nor made known to the jury, and which point and answer are as follows :

6. That the language in the publication made by the defendant in relation to "guilty knowledge of excessive cost" charged in the indictment as defamatory of the members of the board of public grounds and buildings does not in its terms apply to any of the members of said board but to their "custodians ; " and unless the jury are convinced beyond reasonable doubt by evidence outside of the publication that said language was intended to apply to the members of said board, there can be no conviction on account of that part of the publication in which said language occurs. *Answer :* The sixth point is also refused.

(15) In refusing the seventh point submitted by the defendant, which point and answer are as follows :

7. The publication of the language charged in the indictment to be libelous is privileged unless said publication was maliciously or negligently made ; and the burden of proving malice or negligence is upon the commonwealth. *Answer :* That is also refused ; reading that was a mistake. In other words, the fifth, sixth and seventh points are refused.

(16–22) In portions of the general charge, citing same.

(23) In refusing to read or make known to the jury the fifth and sixth points submitted on the part of the defendant.

(24) In that the charge as a whole confined the attention of the jury to the commonwealth's view of the case, to wit:

that the article published by the defendant imputed corruption to the prosecutors.

*Edwin W. Jackson, Jas. A. Stranahan,* and *Thomas H. Murray,* with them *James Scarlet* and *Lee L. Grumbine,* for appellant.—It is submitted that the indictment preferred in this case is fatally defective and that there was error in refusing the motion to quash and in arrest of judgment.

That the language charged in the first count is not per se libelous of the prosecutors, goes without saying : Miller v. Maxwell, 16 Wend. 9 ; Hall v. Blandy, 1 Young & Jervis, 480.

As further sustaining the contention of the appellant we refer to Bloss v. Tobey, 19 Mass. 320 ; Carter v. Andrews, 33 Mass. 1 ; Brettun v. Anthony, 103 Mass. 37. The indictment should have been quashed.

Attention is called to the very grave irregularity which is made the sixth reason in the defendant's motion in arrest of judgment.

The vice of this style of pleading has been condemned as far back as the case of Tabart v. Tipper, 1 Campbell, 350, which has been recognized as a leading case ever since it has been decided.

Defendant may show in defense of criminal libel " by other passages in the same book or newspaper relating to the matter, or referred to in the libel itself, that the libel was not defamatory, or criminal in the sense imputed to it: " 3 Gr. on Evidence, section 178 ; Rex v. Lambert, 2 Camp. 398.

Plaintiff has the right to have the whole of the publication read from which the alleged libelous parts are an extract: 3 Whar. Criminal Law, section 2597 ; Cooke v. Hughes, R. & M. 112 ; Thornton v. Stephen, 2 M. & Rob. 45.

There is a special reason why the whole of this publication should have been considered by the jury, in that it was a statement of a general charge with specifications of which three and five are instances, with a request that such general charge of extravagance be investigated, not by an investigation limited to one or two years, but covering a long period of time as is the usual scope of such investigations.

If the whole of the publication was to be considered by the jury, then the circumstances and information under which it

was made should have been considered by them, and for that purpose the excluded evidence should have been admitted.

To determine the application of the words used to the charge of extravagance, or to the allegation of the charge of extravagance, the existence and extent of the extravagance should have been proven. All this evidence was excluded as complained of in the third reason. How could the jury say to which of the two possible conditions the words applied, when but one of them was exhibited to the jury? Cross v. Tyrone Mining Co., 121 Pa. 387; Same v. Same, 128 Pa. 636.

The authorities say that it is a proper inquiry for a jury whether the language charged extravagance or negligence on the one hand, or a crime on the other. "Failure to perform a duty might result from neglect or insufficiency . . . . and does not necessarily impute fraud or dishonesty : " Pittsburg Ry. v. McCurdy, 114 Pa. 554; Goldstein v. Foss, 6 B. & C. 154; Bloss v. Tobey, 19 Mass. 320; Commonwealth v. Child, 30 Mass. 198; Tebbetts v. Goding, 75 Mass. 254; Brettun v. Anthony, 103 Mass. 37.

This evidence was eminently proper and should have been received especially under the charge of the court in affirming the first, second and third points submitted by counsel for the defendant in its charge to the jury.

The error complained of in the fifteenth assignment of error is the refusal of the court to affirm the seventh point submitted by defendant. We contend that this point should have been affirmed as presented. The court had already affirmed the first point of defendant " that the subject-matter of the article and publication is proper for public information." This virtually decided that the communication was privileged, and that it was so privileged may fairly be inferred from the whole charge of the court. Then if the communication was privileged no malice could be presumed against the defendant. Whether a communication is privileged or not is a question for the court, and we believe the court in this case ruled substantially that the communication was privileged. If the publication is privileged then we contend that the burden of proving malice or negligence was upon the commonwealth : Com. v. Singerly, 15 Phila. 368; Briggs v. Garrett, 111 Pa. 404; Press Co. v. Stewart, 119 Pa. 584; Com. v. Rudy, 5 Dist. Rep. 270.

The court erred in its consideration of the question of probable cause in the twenty-first and twenty-second assignments of error in holding that the defendant must have such information and knowledge " as would have been sufficient to warrant him in commencing and carrying on a criminal prosecution." This goes too far. This would mean such information as would produce conviction. The doctrine of probable cause never went so far.

In this cause no more was required of the defendant, than, as a prudent man, he published the article as true, and that he obtained his information from reliable sources and had every reason to believe it. In this case he came fully under the definition of probable cause as laid down by this court in Coates v. Wallace, 4 Pa. Superior Ct. 253.

In the trial of a cause depending upon the facts in evidence, if the court in their charge to the jury review those only which have a tendency to establish one side of the case, it is calculated to mislead the jury, and is an error for which the judgment will be reversed : Parker v. Donaldson, 6 W. & S. 132 ; Penna. R. R. v. Berry, 68 Pa. 272; Leibig v. Steiner, 94 Pa. 462; Reichenbach v. Ruddach, 127 Pa. 564; Phila. Trust, etc., Co. v. P. & E. R. R. Co., 177 Pa. 38 ; Herrington v. Guernsey, 177 Pa. 175 ; Lerch v. Bard, 177 Pa. 197 ; Minick v. Gring, 1 Pa. Superior Ct. 484 ; Com. v. Goldberg, 4 Pa. Superior Ct. 142.

Following the course of judicial procedure his counsel submitted written points of law to the court requesting the court to instruct the jury upon them. These points embraced the law, as stated in them, applicable to the facts and circumstances of the case as believed by defendant's counsel. The defendant had a right to have these points read and made known to the jury. The court had no right to refuse to read the points. The jury in some way are the judges of the law under this constitutional provision under the direction of the court.

*C. H. Bergner* and *Lyman D. Gilbert*, with them *Kunkel & Millar, George S. Graham* and *Meade D. Detweiler*, district attorney, for appellee.—We believe the verdict rendered in this case was logical, and that it was morally and legally right. At no time was it pretended by the defendant that he could prove the truth of any charge of fraud and corruption against the members of the

board of public grounds and buildings and their superintendent. When confronted with the necessity of making defense to the charge of criminal libel the only substantive question which the defendant could raise was whether the publication of admittedly erroneous charges had been made after a proper inquiry into facts, or upon proper information from responsible sources and with probable cause. A large part of the testimony sought to be introduced for this purpose was of information as to what the defendant called extravagance, which information the defendant received after the publication had been made and widely circulated. Certainly this in no manner excused the publication or showed that it had been made after due inquiry and with probable cause, and therefore the offer of such testimony was properly rejected: Pease v. Shippen, 80 Pa. 513; Fitzgerald v. Stewart, 53 Pa. 343. Then there was offered testimony that information had been received by the defendant prior to the publication which justified him in believing that articles purchased by the state had been paid for at excessive or extravagant rates; but at no time in connection with such testimony was it offered to show that the members of the board of public grounds and buildings, or their superintendent, had any knowledge of the matters referred to, and not even was it suggested that the testimony by inference could show that those persons were fraudulently and corruptly or in any other matter connected with such extravagance or excessive cost, even if it did exist. The issue on trial being whether the defendant had charged the prosecutors with such fraudulent and corrupt conduct as would amount to crime certainly evidence which fell short of showing or tending to show, either directly or inferentially, that the prosecutors were connected in some fraudulent or corrupt way with alleged extravagance or excessive cost of articles purchased by the state could not be admitted. The admission of such testimony would be very like the offered testimony of a record showing that A was bail for B for the purpose of excusing a publication that A had been arrested on a bail piece and incarcerated in jail, as reported in the recent case of Collins v. News Co., 6 Pa. Superior Ct. 330.

What he intended to charge was not an issue to be submitted to the jury. His intention is not sufficient; not even will his belief suffice. His intention with respect to the publication

made and his belief as to what the charges therein contained meant can only be inferred and determined by the language used and the reasonable and probable cause upon which his belief rested : Collins v. News Co., 6 Pa. Superior Ct. 330; Winebiddle v. Porterfield, 9 Pa. 137; Chapman v. Calder, 14 Pa. 365 ; Smith v. Ege, 52 Pa. 419.

The publication made by the defendant was made with all the means at hand for ascertaining the truth or falsity of his charges. He neglected to avail himself of these and made the publication in ignorance of the truth, preferring to rest his charges upon vague, indefinite and uncertain information picked up on the sidewalks.    Under such conditions there could be no claim to privilege: Coates v. Wallace, 4 Pa. Superior Ct. 253; Shelly v. Dampman, 1 Pa. Superior Ct. 115 ; Conroy v. Times, 139 Pa. 334.     .

OPINION BY SMITH, J., November 21, 1898 :

The defendant has been convicted of a libel on the superintendent of public grounds and buildings, and the state officers who are by law commissioners of public grounds and buildings, in their official character as such.    The alleged libel was contained in an article published in a newspaper of which the defendant was editor.

In defense, it is contended that this publication " does not libel or charge any criminal act upon any of the individuals alleged to have been libeled;" that the indictment " does not charge any indictable offense," and is also defective in the manner of setting forth the alleged libel; and, further, that the publication relates to the official conduct of officers or men in public capacity, and was not maliciously or negligently made, and is therefore privileged under the constitutional provision on the subject.    The case thus involves questions of the highest importance; on the one hand, the right of a public officer to protection to his reputation, and, on the other, the right of the citizen to investigate the official conduct of men acting in a public capacity, and to publish his conclusions.    These rights are alike secured by constitutional guaranty.

The importance of maintaining freedom of discussion, through an untrammeled press, in all matters affecting the public, has been steadily recognized since the independence of the common-

wealth was declared. The first constitution of the state, adopted September 28, 1776, asserted "that the people have a right to freedom of speech, and of writing, and publishing their sentiments," and further declared that "the printing presses shall be free to every person who undertakes to examine the proceedings of the legislature, or any part of government." These provisions were again incorporated in the organic law, with important additions, by the following clause of the constitutions of 1790 and 1838: "The printing presses shall be free to any person who undertakes to examine the proceedings of the legislature, or any branch of government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man; and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty. In prosecutions for the publication of papers investigating the official conduct of officers or men in a public capacity, or where the matter published is proper for public information, the truth thereof may be given in evidence; and in all indictments for libels the jury shall have a right to determine the law and the facts, under the direction of the court, as in other cases." Thus, while held to a just responsibility for abuse of the liberty granted, the press was freed from all antecedent restraint by this prohibition of censorship; and on an indictment for an alleged abuse of liberty, in publications relating to official conduct, etc., the truth of the matters published formed a justification.

The constitution of 1873 retained these provisions relating to the freedom of the press, with their scope enlarged and with an important modification of the measure of defense on an indictment for libel. Instead of requiring the truth to be shown, by evidence as broad as the defamatory matter, the publication is excused by proof that it was proper for public information and was not maliciously or negligently made. Section 7 of the declaration of rights,—the existing constitutional provision on the subject,—is as follows: "The printing press shall be free to every person who may undertake to examine the proceedings of the legislature, or any branch of government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invalu-

able rights of man; and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty. No conviction shall be had in any prosecution for the publication of papers relating to the official conduct of officers or men in public capacity, or to any other matter proper for public investigation or information, where the fact that such publication was not maliciously or negligently made, shall be established to the satisfaction of the jury; and in all indictments for libels, the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases."

While thus securing liberty to the press, the constitution has also steadily aimed at guarding against its abuse. Among the rights declared by the constitutions of 1790, 1838 and 1873 to be "inherent and indefeasible," is that of protecting reputation. The rights of the defendant and of the officers alleged to have been libeled in this case, therefore, rest on the same constitutional ground. They demand an exact balance of the scales of justice, that security may be given against unfounded aspersions, and that the honest investigation of official conduct may not be prevented or unduly restrained by fear of unjust prosecution.

The criminal code of March 31, 1860, P. L. 382, section 24, provides for the punishment of libel, and thus defines the offense: "If any person shall write, print, publish or exhibit any malicious or defamatory libel, tending either to blacken the memory of one who is dead, or the reputation of one who is alive, and thereby exposing him to public hatred, contempt or ridicule, such person shall be guilty of a misdemeanor."

Under the constitutional and statutory provisions we have cited, the issue in the case before us presents the following questions:

1. Was the publication made by the defendant, or by his procurement?

2. Does it refer to one or more of the persons named in the indictment as libeled?

3. Is it libelous?

A negative answer to any of these questions is conclusive in favor of the defendant. An affirmative answer to all is a prima facie determination against him, and leaves his defense to rest on the further questions:

4. Does the publication relate to the official conduct of officers or men in public capacity, or to any other matter proper for public investigation or information? If so,

5. Was it maliciously or negligently made?

And it will be justified only by evidence giving an affirmative answer to the fourth question and a negative answer to the fifth.

The publication is admitted, and, beyond question, it is libelous with respect to the persons to whom it may be found to refer. The defendant denies that it refers, or was intended to refer, to the officials whom he is charged with having libeled, or to any of them. His contention is that it was designed as an exposure of a vicious system, and not as an arraignment of the individuals who conducted the system; and, further, that the evidence shows an absence of malice and negligence that protects him against conviction, even should the publication be deemed libelous as to the persons named in the indictment.

Section 7 of the declaration of rights, in effect, places "papers relating to the official conduct of officers or men in public capacity, or to any other matter proper for public investigation or information," substantially on the footing of privileged communications. This privilege is derived from the absence of malice and negligence in the publication of such papers. Malice, in the legal sense, is implied from the publication of any false and defamatory matter, though the person making the publication may not be moved by express or actual malice. To give immunity to such a publication, on the ground of privilege, there must be neither malice nor negligence in making it. It must be made on a proper occasion, from a proper motive, in a proper manner, and upon probable cause for belief in its truth: Neeb v. Hope, 111 Pa. 145; Briggs v. Garrett, 111 Pa. 404; Conroy v. Times, 139 Pa. 334; Jackson v. Times, 152 Pa. 406, 416. An inquiry into the official conduct of officers or men in a public capacity, or into any other matter proper for public investigation or information, presents a proper occasion. A proper motive and manner exclude malice, both in purpose and phrase. Probable cause for belief excludes negligence. This probable cause is judicially defined as "A reasonable ground of suspicion, supported by circumstances sufficient to warrant a cautious man in believing that the party is guilty " of the con-

duct imputed to him: Munns v. Dupont, 3 Wash. C. C. Rep. 31; Winebiddle v. Porterfield, 9 Pa. 137; Chapman v. Calder, 14 Pa. 365; Smith v. Ege, 52 Pa. 419; Coates v. Wallace, 4 Pa. Superior Ct. 253. And this cause must exist at the time of making the publication.

It is obvious that the probable cause that will warrant belief must be found in circumstances of adequate probative force, lying within personal knowledge, or information derived from sources of such a character as to lead a reasonably prudent man to regard it as trustworthy. Mere rumor is not sufficient; nor is it enough that the matters in question have become the subject of general comment or even of widespread belief. To draw illustrations from the case before us, the newspaper press cannot be regarded as, of itself, an adequate source of information. Neither are statements received at second or third hand, or from persons having no direct knowledge of the matter, such as those respecting the alleged presentation of a clock to one of the officials named, and much of the alleged information relating to alterations, improvements, furnishings and decorations in the public buildings, the alterations of Grace Church, the free barber shop, and the rose house. We are far from saying that nothing short of the best evidence can afford a reasonable ground of belief. On this question, no hard and fast line can well be drawn. Yet mere hearsay, in whatever guise, however plausible in aspect, broad in volume, or positive in form, must be pronounced a totally inadequate foundation. The repetition and circulation of a defamatory charge cannot be recognized as a ground for belief in its truth.

The publication in the present case was made on a proper occasion, and we cannot say that it was not made from a proper motive or in a proper manner. The official action of public officers is at all times a proper subject for inquiry by the citizen and for information to the public. But even when investigation may reveal conduct that justly deserves censure, a publication on the subject is not to be made a vehicle for unfounded charges or malicious detraction. The truth is not to be distorted in order to furnish a basis for denunciation or invective. Dereliction in public duty is not to be redressed by calumny. On the other hand, an honest and capable officer has nothing to fear from the fullest investigation into his conduct, when fairly

made, if the purpose of making the inquiry be the ascertainment of truth alone. In the discharge of his duties he is to be governed strictly by law; and the people, whose servant he is, have a right to examine into the administration of his office. To obstruct or hamper such examination particularly through the forms of law, is to discourage the inquiry which the people have a right to make, and encourage unfaithfulness in public trusts; in effect, to place the servant above his master. Least of all should this be tolerated in a court of justice.

The indictment contains two counts. The first charges a libel, contained in a paragraph designated as "3." The second charges the same libel, with other libels contained in a paragraph designated as "5." These paragraphs are as follows:

"3. That new metal furnishings have been paid for by the state, but old ones in use by the state carried into the state house cellar, cleaned and returned, were made to personate the new ones paid for."

"5. That in the purchase of materials and labor, for making additions, alterations, repairs and refurnishing the capitol buildings, and cellars and grounds, also for the executive mansion, and now for Grace Church, the state has lost many thousands of dollars as a result of an unfair system of competitive bidding. In other words, that the cost to the state has been two, three, four, and as high as eight times in some instances, as much as it should have been, and that not all of this money went to the persons furnishing the materials and labor, and further that at least some of the board of public grounds and buildings custodians have guilty knowledge of this excessive cost."

No evidence was offered to justify the application of paragraph "3" to any of the officials named, and the defendant, in his argument, alleges that the paragraph does not refer to any of those officials, and was not so intended, but relates to matters that occurred before the positions held by them with respect to public grounds and buildings were created. As to paragraph "5," the defendant alleges that it was not aimed at the members of the board of public grounds and buildings, but "at a class of persons characterized as their custodians;" and he further contends that to interpret it as charging a conspiracy to defraud the state is "an impossible construction of language." The evidence offered by the defendant for the most part appar-

ently aimed at showing the absence of malice and negligence, by exhibiting probable cause for believing the matters embraced in this paragraph; and nine of the specifications of error are to the rejection of this evidence.

The offer embraced in the third specification lacks the precision that should characterize an offer of evidence, " The reasons which led to the publication, the state of the defendant's information, and the facts with which he was made acquainted," might be fully shown, without disclosing anything tending to prove that the publication was not maliciously or negligently made.   An offer designed to show this should state the source of the defendant's information, and the specific facts communicated to him, that the materiality of the evidence may appear. Unless the information upon which the publication was made is such as to afford probable cause for belief in its truth, the presumption of malice or negligence remains.   In deciding on the character of the publication, it must certainly be judged as a whole, since the actual meaning and application of any passage may depend largely on the context.   The defendant was therefore entitled to have the entire article given in evidence. His complaint of its exclusion, however, is entirely unfounded. The notes of evidence printed in the appellant's paper-book show that it was introduced by the commonwealth, and paragraphs 3 and 5 offered in evidence; that the defendant's counsel moved the reading of the whole; that the trial judge ruled that " the whole article must go in evidence; " that the counsel for the commonwealth replied: " The whole article is before the jury for their use, and will be expected to go out with the jury ; " that the trial judge then said: " The other side can read it now if they choose; they can read the whole article;" and that counsel for the defendant thereupon read the whole article to the jury.   It was laid before the jury without restriction; the trial judge submitting to them the question whether paragraphs 3 and 5 charged the prosecutors with fraud and corruption, and adding: " You have to determine that, as I say, from the article itself, from the paragraphs, from the article in which those paragraphs appeared, and from the testimony."   Twice previously, in the charge, he had said to the jury, " You will have the paper out with you," and there is no allegation that it was not sent out with them.

As to the fourth specification, it is sufficient to say that the article was in no sense a privileged communication addressed to the legislative assembly for the correction of an abuse. While in form a suggestion that the legislature adopt a proposed method of investigation, it was in fact, a mere publication in the defendant's newspaper, and, so far as shown, was not communicated to the legislature. It could derive no privilege from its form alone. The only basis for the claim of privilege is that it relates to the official conduct of men in public capacity, and was therefore made on a proper occasion; that it was made from a proper motive, in a proper manner, and with probable cause for belief in its truth, and therefore not maliciously or negligently. The article is not evidence of the circumstances that led the defendant to write it, and those circumstances are material only so far as they present ground for belief in its truth.

The fifth to the eleventh specifications, inclusive, may be considered together. While, in some respects, the offers lack precision, the apparent purpose of the evidence offered was to show probable cause for belief that the matters contained in paragraph 5 were true. The ground of its rejection appears to have been that it was not coextensive with the allegations; that the officers named were charged by the defendant with fraud and corruption, while the evidence offered tended only to show extravagance. This view is entirely *too* narrow. True, the indictment avers that the defendant meant, in paragraph 3, to charge the officers named with defrauding the state by corruptly approving a bill for metal furnishings never received, and, in paragraph 5, to charge them with conspiring to pay certain persons for labor and materials from two to eight times as much as the price for which other bidders were willing to furnish the same, with intent to defraud the state by corruptly misappropriating the public moneys to themselves and others. But the commonwealth cannot, in the absence of direct accusation, arbitrarily fix the quantum of detraction implied or intended in the publication, and demand a corresponding measure of proof in defense. Whether the charge intended was corruption, extravagance, or merely carelessness, in the expenditure of public money by the superintendent or the commissioners of public grounds and buildings, is to be determined by the jury, from the natural

meaning of the language and the extrinsic matters offered in evidence to indicate the sense in which it was used. Further than this, proof of extravagance has a very obvious bearing on the question of fraud and corruption. Extravagance in the expenditure of public money, while not of itself necessarily corrupt, has such an obvious association with fraud as to form one of the most significant circumstances pointing to corruption, particularly when a method of expenditure not conforming to statutory provisions is employed, as the defendant here alleges with respect to certain items. Misappropriation of public money is usually accomplished through extravagant expenditures, or the evasion of legal restrictions, rather than by direct theft. Even in the absence of corruption, the mere reckless expenditure of public money is odious to the people, and language imputing no more than this may fall within the statutory definition of libel by exposing to public hatred, contempt or ridicule. A publication may be libelous, though it charge no criminal act. Giving to the language employed in the present case the meaning assigned to it by the commonwealth, it was still a question for the jury whether this meaning was intended by the defendant. This was their exclusive province under the constitutional mandate that "In all indictments for libels, the jury shall have the right to determine the law and the facts under the direction of the court, as in other cases." All evidence fairly tending to show what the defendant intended, by the language employed, or to show that the charge actually intended was not maliciously or negligently made, was proper for their consideration. Proof of extravagance is unquestionably evidence of this nature; its sufficiency, as a ground for the inference of corruption, depending largely on the attending circumstances. In the admission of testimony bearing on the questions of malice, negligence and intent, when the absence of these is an essential element of the defense on an indictment for libel, a liberal latitude should be permitted, and nothing reasonably calculated to show a tenable ground of defense should be excluded through technical narrowness in construing or applying the rules of evidence. It is proper to add that no implication of fraud or corruption necessarily arises from the matters referred to in the eighth specification. It cannot be contended that the state is debarred from using a desirable article, merely because it is the

subject of a patent controlled by one person and therefore beyond the field of competitive bidding. Here, as in other purchases, all the circumstances, including that of cost, and of comparative value, are to be considered in determining whether the evidence is such as to justify the inference of fraud or even of extravagance.

The twelfth specification is without merit. The evidence embraced in it was clearly competent for the purpose of meeting the testimony of the defendant on the subject. It may, indeed, have been unnecessary, since the defendant's testimony failed to show his possession of information affording probable cause for belief; but it was not for that reason inadmissible. The questions involved in the thirteenth and fourteenth specifications were for the jury, and were submitted with adequate instructions. The contention that paragraph three cannot be understood as referring to the superintendent or the commissioners of public grounds and buildings, for the reason that it relates to a transaction prior to the creation of those offices, is without foundation. There is nothing in the paragraph to indicate the date of the occurrence. That the matter charged is impossible, is no defense: Kennedy v. Gifford, 19 Wend. 296. To charge the murder of a person who, at the time, is living, is actionable: Eckart v. Wilson, 10 S. & R. 44. The point embraced in the fifteenth specification was properly refused. Malice and negligence are in law presumed from a defamatory publication. When the defense is based on their absence, the burden of proving this is on the defendant. The commonwealth may, in its discretion, offer evidence in rebuttal.

Whether, upon all the evidence, the fact that the publication was not maliciously or negligently made is established to the satisfaction of the jury, is for them to determine.

There was no error in not reading to the jury the points which were refused; on the contrary, this is the better practice. It is the duty of the trial judge properly to instruct the jury, but this does not require him to read to them instructions asked for which he declines to give. It contributes to clearness, and to freedom from confusion and the danger of misapprehension, for the jury to hear only the directions they are to regard. In Com. v. Clark, 3 Pa. Superior Ct. 141, the practice here followed by the trial judge was approved by this court, upon a full consideration of the question, and a review of the authori-

ties, in an opinion by our late brother WICKHAM. It has been sustained by the Supreme Court, in the case of Woeckner v. Motor, 187 Pa. 206.

What we have already said applies to the portions of the general charge assigned for error, so far as these relate to the questions we have considered. Nothing in the assignments requires further discussion except the first and second specifications.

While a judgment quashing an indictment may be reviewed on error, it is questionable, at least, whether an exception lies to a refusal to quash. This point seems not to have been decided by the courts of our own state. In Massachusetts and New York, however, it has been decided that at common law a motion to quash is addressed to the sound discretion of the court, and that it is discretionary to grant it, or to refuse, and leave the defendant to his demurrer or motion in arrest of judgment: Com. v. Eastman, 1 Cush. 189; People v. Eckford, 7 Cowen, 535; People v. Davis, 56 N. Y. 95. In the present case the motion to quash and the motion in arrest are based on substantially the same grounds. These will be considered on the latter motion, since a decision thereon will dispose of the questions involved in the former. The only reasons, however, which appear to require discussion are (1) that the indictment does not charge the defendant with any indictable offense; (2) that it does not sufficiently connect the prosecutors with the matters alleged in the publication; (3) that it charges an offense not laid in the information. Though the second reason is not stated with the precision that should be observed, we may regard it as in legal effect included in the first.

When language of the character described in the statute is applied to a person by name, there can be no question of its meaning or application. In such case it is only necessary, in an indictment, to identify the prosecutor as the person named by an averment that the language was published of and concerning him. But where the language does not necessarily tend to blacken character, or expose to public hatred, contempt or ridicule, or where the person to whom it refers is not named, it becomes necessary to so frame the indictment as to show the defamatory meaning of the language and its application to the prosecutor.

In the present case the publication, in the natural meaning of the language employed, charges that a wrong has been done

to the state. But no person being named as guilty of this, it is necessary that the indictment should so connect the officials named therein with the alleged wrong as to indicate distinctly the application of the language to them. The defendant argues that this has not been done; that the indictment fails to set forth, by proper averments, the matters necessary to show that those officials are the persons to whom the publication refers, and that by reason thereof it falls short of averring, with the requisite distinctness, that the publication is libelous as to them, and therefore charges him with no offense. The question thus raised is to be determined by the application of established principles of pleading.

When the publication does not, of itself, bear the defamatory meaning ascribed to it, or indicate the person at whom it is aimed, but these depend on something extrinsic to it, the averments employed in pleading to show the import contended for, or the person to whom it refers, naturally fall into an orderly arrangement in three divisions, each having a distinct office and technical designation. The necessary extrinsic matters are stated in a prefatory way, and are designated as the inducement, or averment. Next follows a statement of the matters necessary to connect the language with the extrinsic circumstances, and to show that it was published of and concerning the person mentioned or the matters set forth in the inducement. This is designated as the colloquium. Its scope and sufficiency must depend on the character of the language, the nature of the extrinsic facts embraced in the inducement, and the readiness with which the alleged connection between them can be shown. Lastly, the defamatory meaning which, it is contended, attaches to the language by reason of the antecedent matters averred, is set forth. This averment respecting the interpretation is designated as the innuendo. It is merely explanatory of the preceding averments, and cannot supply any deficiency in those. It cannot enlarge the natural meaning of the words employed, or fix on them a strained or artificial import; it has no other purpose than to specify the defamatory sense imputed to them. When the publication is, per se, libelous of a person named, neither inducement, colloquium nor innuendo, as here described, are necessary; they become requisite only when the person referred to is not clearly designated, or when the language is ambiguous, or susceptible of more than one meaning,

or while it is apparently inoffensive an obnoxious meaning may arise from the extrinsic facts, and it becomes defamatory by reason of the specific sense in which it is used.    Briefly, when the publication is not directly defamatory of any person, the pleading must indicate its meaning, and to whom it refers ; and for this purpose the essentials of a count are : (1) An inducement setting forth sufficiently the extraneous matters which, it is alleged, give the language the meaning or application contended for ; (2) an adequate colloquium, showing this meaning or application ; (3) an innuendo declaratory of the sense in which it is alleged the language was used.    These, as a whole, must contain everything necessary to make the publication intelligible in the sense thus imputed to it, and to show its defamatory character with respect to the person to whom it is alleged to refer.    Whether, in the light of the inducement and colloquium, the language will fairly bear the meaning ascribed to it by the innuendo,—that is to say, whether it is to be pronounced, in law, libelous,—is to be determined by the court ; whether this meaning was intended by the defendant, is to be determined by the jury upon all the evidence.

These principles apply alike to libel and slander, and to criminal prosecutions and civil actions.    They are discussed and illustrated in numerous cases decided by the courts of our own and other states.    Many of these are collected in 1 Am. Lead. Cas. 138, in the notes to Van Vechten v. Hopkins, 5 Johns. 211.    Among Pennsylvania authorities are Bornman v. Boyer, 3 Binney, 515 ; Thompson v. Lusk, 2 Watts, 17 ; Shultz v. Chambers, 8 Watts, 300 ; Gosling v. Morgan, 32 Pa. 273 ; Herst v. Borbidge, 57 Pa. 62 ; Stitzell v. Reynolds, 59 Pa. 488 ; Com. v. Keenan, 67 Pa. 203 ; Collins v. Pub. Co., 152 Pa. 187.

In each count of the indictment before us, the inducement sets forth the official character of the persons charged to have been libeled, with their duties and the mode in which the performance of these is by law directed.    The innuendo sets forth the defamatory meaning which, it asserts, was intended by the defendant in the language complained of.    No objection is made or could well be made to the sufficiency of either.    The error alleged is thus narrowed down to the sufficiency of the colloquia, and to the charge in the second count not included in the information.

Briefly, in the first count, the colloquium sets forth the lan-

guage as composed and published of and concerning the officials named, and of and concerning the superintendent of public grounds and buildings, as such, and of and concerning him in the performance of his official duties, and of and concerning the officials who then and there constituted the board of commissioners of public grounds and buildings. In the second count it sets forth the language as composed and published of and concerning the same officials, as the board of commissioners and the superintendent of public grounds and buildings, and of and concerning them in the premises.

If we still held to the technical strictness in pleading which was formerly enforced, it might not be difficult to demonstrate, by the hair-splitting standard that once prevailed, the insufficiency of these averments in not elaborating, in formal and artificial phrase, matters necessarily implied from the natural and obvious relation between the inducement and the publication. But, as was said in Com. v. Keenan, 67 Pa. 203, "It is evident from the current both of decision and legislation that criminal pleading is no longer the technical thing it was, and that the courts should look more to substantial justice than to artificial nicety." In Sherban v. Com., 8 Watts, 212, quoted with approval in Com. v. Keenan, the rule was laid down that "indictments require only the same certainty as declarations, namely, certainty to a certain intent in general, and not certainty in every particular, as is required in pleading an estoppel: Co. Lit. 303; Rex v. Lawley, 2 Str. 904; 1 Chit. Cr. Law, 169. It is a rule that that which is apparent to the court, and appears from a necessary implication, need not be averred: 4 Bac. Abr. 322. It is sufficient in indictments that the charge be stated with so much certainty that the defendant may know what he is called on to answer, and that the court may know how to render the proper judgment thereon. Overnice exceptions are not to be encouraged, especially in cases that do not touch the life of the defendant: Chit. Cr. Law, 170, 221; 2 Hale, 193." This view was approved also in Com. v. Commercial Bank, 28 Pa. 391, and in Election Cases, 65 Pa. 20. In the former case it was said: "It is not necessary that the acts constituting the offense be particularly described with all their circumstances, if it can be distinctly defined without this, and much of the particularity of pleading comes from an abundant caution, rather

than from the requirements of the law ; " and the language of Chief Justice GIBSON in Hartmann v. Com., 5 Pa. 60, and in Updegraff v. Com., 6 S. & R. 5, is thus referred to : "Precision in the description must be sufficient to 'mark the limits of the accusation and fix the proof of it.' The purpose to be aimed at in describing the offense is to define the act and the criminal element contained in it, so as to point the proof and the defense, and furnish reasonable security against the repetition of the charge." In Com. v. Frey, 50 Pa. 245, it was said, "By the criminal procedure act of 1860, the extreme niceties and refined technicalities which prevailed in relation to indictments are abolished, and an indictment is now little more than a simple statement of the offense, such as good sense and regard for the accused alone would suggest."

The act of March 31, 1860, section 11, provides that "every indictment shall be deemed and adjudged sufficient and good in law, which charges the crime substantially in the language of the act of assembly prohibiting the crime, and prescribing the punishment if any such there be, or, if at common law, so plainly that the nature of the offense charged may be easily understood by the jury." This provision is to be construed with reference to the relaxation of the rules of pleading, in relation to technical niceties, which has long obtained in this state. The averments that enter into an indictment for libel are such that, literally, the crime cannot be charged, even substantially, in the language of section 24 of the act of 1860, supra. That section, however, merely gives statutory form to the common-law definition of libel ; hence with respect to pleading, the indictment may properly be regarded as charging the offense at common law. It is therefore sufficient "if it charges the crime so plainly that the nature of the offense charged may be easily understood by the jury."

In the present case, the publication alleges, directly or by plain inference, official dereliction in certain matters lying clearly and exclusively within the scope of the duties imposed by law on the superintendent and commissioners of public grounds and buildings, as these are set forth in the inducement. As the persons at whose dereliction it is aimed, it points unmistakably to the officials upon whom the law places all responsibility in the premises. Hence any violation of duty which it alleges

is necessarily alleged of and concerning the persons named in the inducement as the superintendent and commissioners of public grounds and buildings, in their official character. This is an implication so manifest that it is impossible to understand the publication in any other sense. The averment in the colloquia, therefore, that the language was composed and published of and concerning the superintendent and commissioners of public grounds and buildings, as such, adequately exhibits the connection between the inducement and the publication; for the officers named, in the inducement, in their official character, and they alone, were responsible for the matters charged. The crime of which the defendant is accused is, unquestionably, stated "so plainly that the nature of the offense charged may easily be understood by the jury." In the manner of charging it there is clearly certainty to a certain intent in general, which is all that is required in indictments. The reference to the superintendent and commissioners of public grounds and buildings, as the persons at whom the publication is aimed, "is apparent to the court, and appears from a necessary implication." It is obvious, also, that "the charge is stated with so much certainty that the defendant may know what he is called on to answer, and that the court may know how to render the proper judgment thereon." Thus, testing the indictment by the standard arising from the act of 1860, and the authorities cited, it exhibits no such structural weakness as would make a judgment on it erroneous, but must be "adjudged sufficient and good in law."

The complaint of an unwarranted connection between paragraphs 3 and 5, in the second count, through the omission of the intervening paragraph 4, does not appear well founded. While there seems no good reason for repeating in this count the charge of libel in paragraph 3 already contained in the first count, the two paragraphs are separately set forth, and with numerical designations indicating a hiatus rather than a connection between them. Paragraph 4 is not found in the information, and there is no allegation that it refers to any of the officials alleged to have been libeled by paragraphs 3 and 5. Hence it can have no proper place in the indictment, nor is any explanation of its absence necessary.

A further objection to the second count is that paragraph 5

was not included in the information. In setting forth this paragraph, the indictment charges a libel on three persons not named in the information, by a publication not set forth in it. As to any defamatory matter contained in paragraph 5, there was no preliminary hearing or binding over. We do not regard the terms of the recognizance, binding the defendant to answer the charge contained in the information " and such other charges as shall be preferred against him " as enlarging its obligation to the extent contended for by the commonwealth. Giving it this effect, a person may be held to answer the charge of an assault on A, and thereupon be required to meet an indictment for the murder of B. The conditions under which an indictment may properly be found without a preliminary hearing are well settled : Green v. Com., 126 Pa. 531. Among these is the action of the district attorney in laying it before the grand jury, on his official responsibility, with leave of the court. It appearing in the present case that the indictment, as found, was sent to the grand jury by the district attorney, with the express leave of the court (a fact undenied by the defendant) the inclusion of paragraph 5 affords no ground for arrest of judgment. It was not shown or alleged that this surprised or prejudiced the defendant. The paragraph was part of the general subject of the article forming the basis of the prosecution, and it was quite reasonable to expect that all parts of it relating to the persons referred to might be resorted to on the trial of any action growing out of it. The first and second specifications are overruled.

The principles upon which the questions arising in this case are to be determined, with their application, have been so fully discussed that further consideration, in detail, of the assignment of errors, is unnecessary. What has been said sufficiently indicates our view of the matters assigned for error and disposes of every material point embraced in the twenty-four specifications, without a separate ruling on each.

The judgment is reversed and a new trial granted.

DISSENTING OPINION BY ORLADY, J., November 21, 1898:

I dissent from the judgment entered by this Court for the reasons given by the court below in refusing a new trial.